ATTORNEYS FOR APPELLANT ATTORNEYS FOR APPELLEE

Susan K. Carpenter Jeffrey A. Modisett

Public Defender of Indiana Attorney General of Indiana

Ann M. Pfarr Arthur Thaddeus Perry

Deputy Public Defender Deputy Attorney General

Indianapolis, Indiana

Juliet M. Yackel

Special Assistant to the

State Public Defender

Indianapolis, Indiana

IN THE

SUPREME COURT OF INDIANA

DARNELL WILLIAMS, )

)

Appellant (Petitioner Below), )

)

v. )  Cause No. 45S00-9303-PD-397

)

STATE OF INDIANA, )

)

Appellee (Respondent Below). )

APPEAL FROM THE LAKE SUPERIOR COURT

The Honorable Richard J. Conroy, Special Judge

Cause No. 2CR-133-886-531

February 19, 1999

SHEPARD, Chief Justice.

A jury found Darnell Williams guilty of the felony murders of John and Henrietta Rease.  In accordance with the jury's recommendation, the trial court sentenced Williams to death.  On direct appeal, we affirmed.  
Rouster v. State
, 600 N.E.2d 1342 (Ind. 1992).  Williams petitioned for post-conviction relief.  The post-conviction court denied the petition and Williams appeals.  He asserts numerous claims which we consolidate and review as follows:

I. Ineffective assistance of counsel;

II. Systemic defects in the Lake County public defender program;

III. Williams' pre-sentencing psychological profile;

IV. Errors of fact in direct appeal opinion;

V. Post-conviction due process.

Facts

Williams and his co-defendant Gregory Rouster robbed and shot to death Rouster's ex-foster parents, John and Henrietta Rease.  
Rouster
, 600 N.E.2d at 1344.  

In the late afternoon of August 12, 1986, Rouster learned from a welfare caseworker that the Reases had received a clothing allowance, amounting to around five or six dollars per month, on his behalf.  About four hours later, Rouster, Williams, and their girlfriends rode a bus to the Reases' neighborhood.  Rouster and Williams entered the home and started to argue with the Reases about the clothing allowance.  After a short time, Mr. Rease ordered them to leave.  Once out in the front yard, Williams said to Rouster "[d]on't let them do you this way" and "[y]ou know they owe you."  (T.R. at 185A.)  Edwin Taylor, another teenager living in the foster-care of the Reases, said "you all have guns . . . go take the money" and told Rouster and Williams that the Reases had money on their bedroom dresser.  
Rouster
, 600 N.E.2d at 1345.     

Both Williams and Rouster re-entered the home.  Williams told Henrietta to get on the floor.  She pleaded with Williams not to hit Mr. Rease because he had a bad heart.  
Id.
 at 1345-46.  Williams replied, "his heart is stronger than mine."   
Id.
 at 1346.  Rouster demanded to be told "where's the money at?", and told Williams to "bring both of them back here."  
Id.
   Williams then said "it's your time."  
Id.
  Rouster was heard to say something like "waste them."  
Id.
  Henrietta pleaded "Greg, why are you doing this?" 
Id.
  

The police apprehended Williams after a foot chase which included a dash across a busy highway intersection.  
Id.
 at 1345.  Williams had a pouch containing $232 in cash and a wristwatch at the time of his arrest.  He also had some .30 caliber ammunition.  
Id.
  Several shells of the same caliber and brand were discovered on the floor of the Reases' home.  
Id.
  Tests indicated that John Rease had been killed with a .32 caliber bullet while a .22 caliber bullet was found in Henrietta's brain.  
Id.
  

Standard of Review

Post-conviction procedures do not afford the petitioner with a super-appeal.  Instead, they create a narrow remedy for subsequent collateral challenges to convictions, challenges which must be based on grounds enumerated in the post-conviction rules.  Ind.Post-Conviction Rule 1(1);  
Weatherford v. State
, 619 N.E.2d 915 (Ind. 1993).  Petitioners bear the burden of establishing their grounds for relief by a preponderance of the evidence.  P-C.R. 1(5); 
Weatherford
, 619 N.E.2d at 917.  If an issue was known and available but not raised on appeal, it is waived.  If it was raised on appeal but decided adversely, it is res judicata
.  
Lowery v. State
, 640 N.E.2d 1031 (Ind. 1994), 
cert. denied
, 516 U.S. 992 (1995).

When one appeals the negative judgment of a post-conviction court, the standard is even more rigorous.  Petitioners must show that the evidence as a whole, "leads unerringly and unmistakably to a conclusion opposite to that reached by the trial court."  
Weatherford
, 619 N.E.2d at 917.  

I.  Ineffective Assistance of Counsel 

The right to effective assistance of trial and appellate counsel has been firmly established by the U.S. Supreme Court and by this Court.  
United States v. Cronic
, 466 U.S. 648, 654 (1984); 
King v. State
, 467 N.E.2d 726, 728-29 (Ind. 1984).  In his post-conviction petition, Williams listed more than sixty alleged errors to show trial counsel ineffectiveness.
(footnote: 1)  The post-conviction court considered Williams' claims and concluded that "the allegations fail to establish that counsel's overall performance was deficient as measured by prevailing professional norms" and that "the petitioner has failed to persuade us that the outcome of the trial or sentencing hearing would have been different but for trial counsel's performance."  (P-C.R. at 1317-18.)  

We analyze claims of ineffective assistance of trial and appellate counsel under the two part test announced in 
Strickland v. Washington
, 466 U.S. 668 (1984).  To prevail on an ineffective assistance of counsel claim, one must show both deficient performance and resulting prejudice.  A deficient performance is a performance which falls below an objective standard of reasonableness.  
Strickland
, 466 U.S. at 687 (1984); 
see also
 
Douglas v. State
, 663 N.E.2d 1153, 1154 (Ind. 1996).  Prejudice exists when a claimant shows "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  
Strickland
, 466 U.S. at 694; 
see also
 
Cook v. State
, 675 N.E.2d 687, 692 (Ind. 1996).
(footnote: 2)  

Even if the claimant succeeds in showing a reasonable probability the results would have been different, he must also show his conviction was fundamentally unfair or unreliable.  
Lockhart v. Fretwell
, 506 U.S. 364, 369 (1993).  A fair trial has been denied a defendant when his conviction or sentence has resulted from a breakdown in the adversarial process which rendered the result unreliable.  
Strickland
, 466 U.S. at 686; 
see also
 
Canaan v. State
, 683 N.E.2d 227, 229 (Ind. 1997), 
cert. denied
, 118 S. Ct. 2064 (1998).  The two prongs of the 
Strickland
 test are separate and independent inquiries.  Thus, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."  
Strickland
, 466 U.S. at 697.  An appellant/petitioner must offer strong and convincing evidence to overcome the presumption that counsel prepared and executed an effective defense.  
Burris v. State
, 558 N.E.2d 1067, 1072 (Ind. 1990), 
cert. denied
, 516 U.S. 922 (1995).  

On appeal from the post-conviction court, Williams re-asserts his trial counsel were ineffective for the following reasons:  (a)  counsel failed to conduct a minimally adequate review of discovery materials, (b) failed to advocate sufficiently for a motion for severance, (c) failed to prepare adequately for the penalty phase of trial and the sentencing hearing, (d) failed to investigate the crime scene evidence adequately, and, (e) failed to object to erroneous instructions.  We review each of Williams' claims in the following subsections.
(footnote: 3)

A.  Inadequate Review of Discovery.
  Williams argues that counsel were ineffective for failing to review fully materials given to them by the State during discovery.  Specifically, Williams points to his counsel's failure to realize that a report by State's expert Kimberly Epperson showed that blood found on Williams' shorts was consistent with the blood of either John Rease, Henrietta Rease, or Gregory Rouster.  (P-C.R. at 4424; T.R. at 1852-58; T.R. at 1966-67.)  He claims that had his counsel known about the blood before trial, they could have revealed to the jury that the evidentiary chain of custody was suspect,
(footnote: 4) hired a serology expert to testify that 45% of all people in Indiana have a blood type which matches that found on the shorts, and hired a blood splatter expert to refute the State's closing argument about the significance of the blood.  (Appellant's Br. at 30-41.)  Williams believes that these failures fall below an objective standard of reasonable representation.  

Williams also asserts, as he must to succeed under 
Strickland
, that the blood evidence was determinative regarding his conviction and, alternatively, his sentence.  To bolster this contention, Williams relies on comments made by the State in its closing argument, by the trial judge in his findings of fact, and by Williams' trial counsel in post-conviction testimony.  (Appellant's Br. at 27, 40, 42-43.)

     

The post-conviction court agreed that counsel's oversight of discovery materials indicating that blood had been found on Williams' shorts was difficult to excuse in light of the significance of the evidence.  The court concluded, however, that the outcome of the trial or sentencing hearing was not affected by that oversight and thus that Williams had not shown he was prejudiced by counsel's failure.  (P-C.R. at 1321.)  The post-conviction court wrote:

The petitioner takes the position that trial counsel could have, and should have, obtained the services of expert witnesses who might have established that the blood found on the petitioner's shorts got there through transference from other blood stained evidence or, at least, was not necessarily evidence that he was present at the time the victims were shot.  He also argues that the experts would have been able to contradict or mitigate the trial court judge's determination that there was significance in the fact that the blood appeared on the front of the petitioner's garments and on the back of the co-defendant.  Once again, we conclude that evidence of who actually fired which shots does not make a difference under the facts of this case.  The petitioner joined his codefendant in a double homicide in the perpetration of a robbery.  He was "an equal partner" in the crimes, and his participation in the killings - the true extent of which may never be known - was found by the supreme court to justify the death sentence.

(
Id.
 at 1322.)  

Our review of the evidence presented by Williams and of the trial record leads us to conclude the post-conviction court was correct for two reasons:  Williams' counsel did inform the jury of the blood evidence issues Williams raises here, and the evidence available to the judge and jury would have not been significantly different if Williams' counsel had hired expert witnesses.  

Williams' counsel initiated the adversarial testing process in regard to the blood stain evidence when he addressed the potentially misleading nature of such evidence during his closing argument, saying:

The other item that the State emphasized is the blood on the shorts.  The State apparently could have, but did not bring . . . splatter experts. . . . That analysis could have been done if the State felt it would have assisted them in the case, because we didn't have an expert here that could testify to that.  So, absent that, all we have from expert testimony is that that blood could have come from either of the Reases or from Greg Rouster or any millions of other people in the world, not Darnell, which was excluded.

(T.R. at 2550.)  Additionally, in his rebuttal of Gregory Rouster's closing argument, Williams' counsel pointed out to the jury that they should not rely on the blood patterns found on Williams' shorts, arguing:

Mr. Lewis [co-defendant Gregory Rouster's counsel] uses the word splatter the same way the State sought to introduce evidence of splattering.  We do not have a splatter witness.  We did not hear an expert.  We have no testimony from an expert as to what the pattern of blood means on clothing.  That simply, using the word splatter, does that make that expert testimony, much less testimony?  We have simply been left in the dark on that matter and there's been no evidence presented.

(T.R. at 2594-95.)  

Counsel's arguments were factually supported by the testimony of the State's expert witness on serology, Kimberly Epperson.  When asked what she discovered when she analyzed the blood found on Williams' shorts, Epperson said the blood was "consistent with the blood of either John Rease, Henrietta Rease or Gregory Rouster...."  (T.R. at 1967.)  Epperson acknowledged that a blood type "match" does not indicate that the blood samples derive from the  individual in question.  She also noted that 45% of the world's population has the O blood type and that Mr. Rease, Mrs. Rease, and Gregory Rouster all had O blood types.  Williams' assertion that trial counsel failed to inform the jury of the actual amount of blood found on Williams' shorts is made moot by Epperson's testimony.  When Epperson was asked to describe the size and character of the blood spots found on the shorts, she replied: "they were small spots of blood . . . [a]pproximately less than one centimeter in diameter."  (T.R. at 1968.)  

Counsel's arguments to the jury coupled with the above factual testimony rendered Williams' trial a reliable adversarial testing process.  
See
 
Strickland
, 466 U.S. at 686.  Even if Williams' counsel had more thoroughly investigated the blood evidence, as his counsel was able to do for post-conviction, they would have been unable to provide the jury with any information significantly different from that actually provided by the State's witness.  Because the evidence Williams argues should have been presented would not have significantly changed the facts available to the judge and jurors, Williams was not prejudiced during either the guilt or sentencing phase of his trial.

B.  Motion for Severance.
  On direct appeal, Williams' counsel claimed the trial court erred in failing to grant Williams' motion to sever.  We held that the trial court's denial of Williams' pretrial motion for severance was proper as the motion contained no specific allegations of facts to put the trial court on notice of any mutually antagonistic defenses.  
Rouster
, 600 N.E.2d at 1346.  We further concluded that because Williams failed to renew his motion at the close of evidence the issue was waived on appeal.  
Id.
 (citing Ind. Code § 35-34-1-12(b)).  Williams now recasts the issue as a matter of ineffective assistance of counsel.

Defendants have no absolute right to a separate trial or severance, but they may ask the trial judge to exercise her discretion to grant such a motion.  
Lampkins v. State
, 682 N.E.2d 1268, 1272 (Ind. 1997), 
opinion modified on reh'g
, 685 N.E.2d 698 (Ind. 1997).  We will find an abuse of discretion when a court denies a defendant's properly filed motion for separate trials and the parties' defenses are mutually antagonistic and acceptance of one party's defense precludes the acquittal of the other.  
Lampkins
, 682 N.E.2d at 1272 (citing 
Underwood v. State
, 535 N.E.2d 507, 514 (Ind. 1989)).   A defendant is not, however, entitled to a separate trial merely because a co-defendant implicates that defendant.  
Lampkins
, 682 N.E.2d at 1272.

A substantial portion of both Williams' and Rouster's defense theories centered around their respective assertions that the other fired the fatal shots.  During the guilt phase, each co-defendant's arguments regarding who pulled the trigger were of little relevance because both were convicted for felony murder under Ind. Code § 35-42-1-1(2).  All participants in a robbery or attempted robbery which results in killing by one robber are deemed equally guilty of murder, regardless of which participant actually killed the victim.
(footnote: 5)  
Rogers v. State
, 262 Ind. 315, 320, 315 N.E.2d 707, 709-10 (1974).  During the sentencing phase, the evidence against Williams was strong enough to allow the jury to find that any mitigating factors were outweighed by the State's asserted aggravating factors.  

Additionally, Williams' conduct indicated a reckless indifference to human life.  
Rouster
, 600 N.E.2d at 1350 (citing 
Tison v. Arizona
, 481 U.S. 137, (1987)).  Williams urged Rouster to rob the Reases by saying, "[d]on't let them do you this way" and "[y]ou know they owe you," (T.R. at 185A), even though originally Rouster had left the home at John Rease's request.  Williams and Rouster then re-entered the home.  Williams acted in concert with Rouster in robbing the Reases.  He told Henrietta to get on the floor and when Henrietta pled with Williams not to hit Mr. Rease because he had a bad heart,  Williams replied, "[h]is heart is stronger than mine."  
Rouster
, 600 N.E.2d at 1345-46.  Rouster then demanded "where's the money at?" and told Williams to "bring both of them back here."  
Id.
 at 1346.  Whether or not Williams actually pulled the trigger, he knew that the Reases were going to be murdered and he actively participated in the killings.  It was Williams who told the Reases, "it's your time."  
Id.
  Rouster was then heard to say something like "waste them."  
Id.
  Physical evidence would also have been available against Williams even if a separate trial had been granted.  Blood found on Williams' shorts was consistent with the blood of either John Rease, Henrietta Rease, or Gregory Rouster, but not consistent with the blood of Teresa Newsome, Edwin Taylor, or Darnell Williams.  (T.R. at 1966-67.)  Based on this evidence, Williams' sentence would have been the same even if he had been granted a separate trial.  

C.  Preparation for Penalty Phase.
  Williams asserts his counsel were ineffective during the penalty phase for failing to present evidence showing his traumatic birth, his hyperactivity, his placement in special education classes, his violent, abusive, criminal, and alcoholic father, his chaotic home, the poverty of his family, and the destitute neighborhood in which he grew up.  He also argues his counsel should have presented evidence showing he once saved another person's life.  

In considering Williams' assertions, the post-conviction court wrote: "We do not believe that any of this, or all of it together, would have been found by the jury or the trial court judge to be mitigating circumstances which were not outweighed by the aggravating circumstances of multiple intentional murders in the perpetration of robbery."  (P-C.R. at 1326.)  The court then concluded that trial counsel's performance was neither deficient nor prejudicial.  (
Id.
)  

Williams provides no evidence which leads us to a result opposite that reached by the post-conviction court.  The mitigating factors Williams asserts are entitled to modest mitigating weight, at most, since none directly affect his culpability.  Williams specifically attempts to focus our attention on his mental state by arguing that the post-conviction court incorrectly rejected his claims of attention deficit hyperactivity, alcohol intoxication delirium, and "borderline" IQ.  He asserts his counsel should have investigated these issues and presented relevant evidence to the jury.  The post-conviction court rejected Williams' factual claims regarding hyperactivity and alcohol intoxication, (P-C.R. at 1323-25), and Williams provides us with no evidence which unerringly contradicts that conclusion.  Regarding Williams' IQ claim, even if we assume the claim is factually valid, we have determined that such evidence is only of "moderate" weight.   
Holmes v. State
, 671 N.E.2d 841, 850 (Ind. 1996), 
cert. denied
, 118 S.Ct 137 (1997).  Because of the significant weight of the aggravating factors proven against Williams, there is no reasonable chance that the addition of this mitigator would have garnered a different result for Williams at trial.

Williams also argues that his counsel only provided him with a "free form" sentencing hearing strategy similar to the one we found ineffective in 
Averhart v. State
, 614 N.E.2d 924, 930-31 (Ind. 1993).  Our review of the record, however, shows that counsel  had an adequate sentencing hearing strategy.  Counsel elicited from Williams' mother that Darnell was twenty years old and asked her to  tell the judge about Darnell's character.  She replied that Williams was the type of person who often helped others and that he advised younger teenagers not to drop out of school.  Counsel further questioned Williams' mother regarding his employment.  She replied that Williams had been working at a convalescent home for close to a year before he was arrested.  Counsel also called other witnesses as well and asked questions relating to additional mitigating factors.  As such, counsel's advocacy easily surpasses the "free-form" performance we described in 
Averhart
.

D.  Inadequate Investigation.
  Williams says his counsel failed to investigate crime scene evidence adequately.  Williams believes that evidence presented by the State inaccurately shows an overturned mattress and the positioning of Mrs. Rease's dead body. He further asserts that this misrepresentation was material since the State used the fact that the Rease's bedroom was ransacked and the mattress was overturned to argue that the robbery of the Rease's was similar to a different robbery allegedly committed by Williams and others about a month before.
(footnote: 6)  (
See
 T.R. at 3118-19.)  He asserts that had his counsel adequately investigated, they could have rebutted the State's penalty-phase argument asserting that Williams had a history of prior criminal conduct.  

Williams' claim is effectively mooted by the fact that the trial judge found that Williams "ha[d] no significant history of prior criminal conduct" in his sentencing findings of fact.  (T.R. at 187A.)  In making such a finding, the trial judge necessarily must have decided that the evidence presented by the State regarding Williams' possible participation in the separate robbery was not strong enough to be considered in sentencing.  

Williams argues the evidence affected the jury's sentence recommendation.  As for the crime scene, however, the post-conviction court found that the evidence presented by the petitioner in his attempt to show the body was on the bed or in a position other than that depicted to the jury was not nearly as persuasive as testimony given at the post-conviction hearing which suggested the actual state of the crime scene was properly conveyed by the State's evidence.  The court concluded that the evidence given to the jury correctly represented the crime scene.  (P-C.R. at 1320.)  

Williams' present argument does not lead us unerringly and unmistakably to an opposite conclusion.  The testimony of Officer Michael Gault, which Williams relies on to argue that photographic evidence was manipulated, actually tends to support the evidence as it was represented to the jury.  During the post-conviction hearing, Officer Gault recounted the scene as he remembered it, stating:  "[w]hen we got to the southeast bedroom, I observed the woman in a position whereas in the old westerns, when they were slung across the horse . . . ."  (P-C.R. at 2036-37.)  When asked what Mrs. Rease was laying across, Gault answered "it could have been a dresser. . . . I do recall she was at the edge of the dresser."  (P-C.R. at 2037-38.)  The post-conviction testimony of Officer Rita Dorsey Allen also supports the State's argument that Mrs. Rease was not found on a bed:  "I recall her being -- she was -- her dress was up and she was like sideways, against something."  (P-C.R. at 2249.)  

As to the former robbery, there would still be sufficient evidence for the jury to find that Williams had indeed committed the crime upon which the State based its claim that Williams had a significant past criminal history.  James Jackson recounted how he had been robbed by several men, and Ronald King, Jackson's neighbor, identified Williams as one of the individuals he saw pop up suddenly from Jackson's home a few minutes before Jackson showed up at King's home bloody from having been beaten by his assailants. This testimony much more strongly links Williams to the robbery of Jackson than does the fact that each victim's home was similarly ransacked and it is not affected by crime scene evidence found in the Rease home.  Williams was not prejudiced by his counsel's failure to investigate the crime scene evidence.

Williams also claims that a blood splatter expert could have  told the jury that the police had contaminated blood evidence, which could have possibly provided evidence exculpatory to Williams.  He argues such an expert could have explained to the jury that it was probable that Mr. Rease was shot before Mrs. Rease.  He advances no argument, however, regarding how his counsel's failure to hire such an expert caused his trial or sentence to be unreliable.  Accordingly, we see no prejudice.

E.  Instructions.
  Williams argues his counsel were ineffective for failing to object to certain instructions given by the trial court.  The three instruction errors alleged by Williams are: (a) the instructions did not inform the jury they were to weigh each co-defendant's mitigating and aggravating circumstances separately, (b) the jury should have been instructed on what sentencing alternatives were available to the judge if they did not recommend the death penalty, and (c) the instructions failed to inform the jury that if they found Williams was sufficiently intoxicated, this finding would negate the intent requirements inherent in two of the aggravating factors urged by the State.

 1. Individualized Mitigating and Aggravating Factors

Williams argues his counsel were ineffective for failing to ask the court to instruct the jury that they were obligated to consider whether the death penalty was appropriate for Williams based solely on his own actions and intent.  He argues that without any such instruction the jury could consider evidence entered for or against co-defendant Gregory Rouster to determine his death sentence, thereby violating the Eighth Amendment's requirement of "precise and individualized sentencing."  (Appellant's Br. at 110 (citing 
Stringer v. Black
, 505 U.S. 222, 232 (1992)). 

When a jury or judge sentences an individual to death, the Eighth Amendment requires "an individualized determination on the basis of the character of the individual and the circumstances of the crime."  
Zant v. Stephens
, 462 U.S. 862, 879 (1983) (emphasis omitted).  In Williams' case, the trial court made it clear to the jury that Williams was to be sentenced on the basis of his individual acts and character by instructing them:

The jury may recommend the death penalty be imposed against defendant, Darnell Williams, only if it finds:

1.   that the State has proved beyond a reasonable doubt the existence of one of the aggravating circumstances alleged in the charging information against Darnell Williams, and

2. that any mitigating circumstances that exist for Darnell Williams are outweighed by one or more of the aggravating circumstances for Darnell Williams.

(T.R. at 171A.)  This instruction specifically directed the jury that mitigating and aggravating factors had to exist "for Darnell Williams" before they could recommend that Williams be sentenced to death.       

2.  The Jury's Information Regarding 

Sentencing Alternatives

Williams argues that the trial court erred in failing to instruct the jury at sentencing on what options were available to  the judge if the jury did not recommend death.  The instruction the court actually gave stated:

In the State of Indiana, if the death penalty is not imposed, the sentence for murder is a fixed sentence of from thirty (30) to sixty (60) years.  The presumptive penalty is forty (40) years.  The Court at sentencing imposes a specific number of years within that range.

In the State of Indiana, a defendant can earn credit for good behavior to apply against the sentence, with a maximum allowable credit of fifty percent (50%) of the sentence imposed by the Court.

 

(T.R. at 175A.)  No information within the court's instructions informed the jury about the potential for consecutive or concurrent sentencing.  

The court's procedures complied with the death penalty sentencing statute then in force, Ind. Code Ann. § 35-50-2-9 (West 1986), and thus the court's instructions were within the bounds of Indiana law at the time.
(footnote: 7)  Williams claims, however, that these procedures violated his Fourteenth Amendment right to due process under the Federal Constitution as that right was described in the case of 
Simmons v. South Carolina
, 512 U.S. 154 (1994).  In 
Simmons
, the Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible."   
Id.
 at 156.  Williams reads this case for the broad proposition that a defendant's due process rights are violated whenever the jury is not instructed on the possibility of concurrent or consecutive sentences.  (
See
 Appellant's Br. at 112-16.)

Williams' argument is unavailing.  
Simmons
 was handed down more than a year after we decided Williams' case on appeal.  Because 
Simmons
 was unavailable to either Williams' trial or appellate counsel, we cannot say their respective performances were deficient for their failure in making a claim based on 
Simmons
, even if we accept Williams' reading of that case.

3. Intoxication

Williams says his trial counsel should have offered a penalty phase instruction informing the jury that, if proven, Williams' intoxication could have negated the intent requirements inherent in two of the three statutory aggravating factors alleged by the State--intentionally killing John and Henrietta Rease during the commission or attempted commission of a knowing or intentional taking of property.  

The jury was instructed on the defense of intoxication during the guilt phase, but not during the sentencing phase.  At sentencing, Williams' counsel did not offer an instruction on the intoxication defense as to aggravating circumstances, but did  argue to the jury that the evidence of his intoxication was sufficient to show Williams could not have intentionally killed the victims. (T.R. at 3063.)     

Johnson v. State
 explained how the intoxication defense should be considered within the context of death penalty sentencing.

In Indiana, voluntary intoxication can be offered as a defense to any crime.  It follows a fortiori from the provision of the death sentence statute defining the aggravating circumstance applicable . . . that voluntary intoxication [may be] properly asserted . . . as a defense to . . . aggravating circumstance[s] . . . and as a mitigating circumstance as well.  The basic assumption underlying the defense is that drug and alcohol intoxication may be so severe as to prevent a person from forming a criminal intent, yet not so severe as to prevent that person from performing acts required to commit the crime.

584 N.E.2d 1092, 1099-1100 (Ind. 1992) (citations omitted), 
cert. denied
, 506 N.E.2d 853 (1992).  The intoxication defense is still available to defendants at death penalty sentencing because the State is required to prove its alleged aggravating factors beyond a reasonable doubt before the jury may consider them.  
See
 Ind. Code Ann. § 35-50-2-9(a) (West Supp. 1998).

On the other hand, failure to submit an instruction is not deficient performance if the court would have refused the instruction anyway.  Such would have been the case here.  Each  count of felony murder alleged that Williams killed the victim while committing or attempting to commit the crime of robbery by "knowingly or intentionally attempting to take property."  (T.R. at 19).  The court instructed the jury during the guilt phase that the State was obligated to show that Williams killed the victims "while committing or attempting to commit a knowing or intentional taking of money" from the victims.  (T.R. at 117A.)  Hearing this instruction and the court's instruction on intoxication, the jury found Williams guilty of felony murder.  This verdict was consistent with the considerable evidence that Williams could communicate, deliberate, and act toward a chosen end during his encounter with the Reases.  

We conclude that the trial court would have refused an intoxication instruction and that counsel was thus not deficient for failing to tender one.

II.  Lake County Public Defender System

Williams asserts he was denied his right to effective assistance of counsel because of systemic defects within the Lake County system of providing public defender services for indigent capital defendants.

The case of 
United States v. Cronic
, 466 U.S. 648 (1984) provides a narrow exception to the traditional two prong analysis of 
Strickland
 generally used to determine whether assistance of counsel was effective.  Under 
Cronic
, certain circumstances will negate 
Strickland
's requirement that a defendant prove both specific errors leading to deficient performance and actual prejudice.  
Games v. State
, 684 N.E.2d 466, 479 (Ind. 1997), 
opinion modified on reh'g
, 690 N.E.2d 211 (Ind. 1997).

  

In these cases, the circumstances which allow courts to find ineffective assistance speak for themselves and reference to counsel's actual performance is unnecessary.  
Cronic
, 466 U.S. at 658-59.  Here, by contrast, Williams makes some vague comments about overwhelming  caseloads and inadequate training of an assisting attorney for capital cases, then asserts that his counsel's alleged inadequate performance shows the 
Cronic
 standard has indeed been met.  (Appellant's Br. at 130-32.)  The evidence presented by Williams simply does not come close to triggering 
Cronic
's presumption of prejudice.  We reject Williams' claim for reasons similar to those elaborated in 
Coleman v. State
, 1998 WL 905019 (Ind.); 
Brown v. State
, 698 N.E.2d 1132 (Ind. 1998), 
reh'g denied
; 
Roche v. State
, 690 N.E.2d 1115 (Ind. 1997), 
reh'g denied
.

IV.  Trial Court's Pre-sentence Psychological Questionnaire

Because the facts which follow were discovered after Williams' post-conviction procedure was concluded, we rely on the information provided by appellant's brief and on questions which we ordered to be answered by Judge Letsinger on June 13, 1997.  

Williams apparently filled out a psychological questionnaire
(footnote: 8) to aid the Lake County Probation Department in compiling his pre-sentence investigation report.  Our pre-sentence investigation procedure in place at the time required the court to furnish the defendant with the factual contents gathered through that process so that he may have a fair opportunity to controvert any included material.  Ind. Code Ann. § 35-38-1-12(b) (West 1986).  David Schneider, a trial attorney who worked on Williams' case, provided an affidavit in July 1996 which states, however, that he was not informed at the time of sentencing that Williams had been required to complete the questionnaire.  Schneider also states he was not given a copy of the questionnaire as it had been answered by Williams. (Appendix to Appellant's Br. at A-76.)  Asked whether Williams' trial counsel or Williams himself received a copy of the questionnaire, Judge Letsinger replied:

The questionnaire is an exhibit to the pre-sentence investigation report.  Whenever counsel for the defendant received his copy of the pre-sentence, which is usually  one (1) or two (2) days before the date of sentencing, he got a copy of the questionnaire.

(Appendix to Appellant's Br. at A-79.)
(footnote: 9)  Williams claims the court's failure to provide his trial counsel with the contents of this psychological test violated his federal and state due process rights.
(footnote: 10)

We have recently confronted the issue of Judge Letsinger's pre-sentence questionnaire in 
Matheney v. State
, 688 N.E.2d 883 (Ind. 1997), 
petition for cert. filed
.  In 
Matheney
, we reviewed the aggravating and mitigating factors absent the psychological questionnaire to determine whether the death sentence was appropriate.  
Id.
 at 909 (citing 
Lambert v. State
, 675 N.E.2d 1060, 1065 (Ind. 1996), 
cert. denied
, 117 S. Ct. 2417 (1997)).  Because the circumstances we confront here are procedurally identical, we will engage in the same type of review.

The aggravating circumstances charged by the State were that  Williams:

1.   Intentionally killed John Rease during the commission or attempted commission of a knowing or intentional taking of property . . .

and/or

2. Intentionally killed Henrietta Rease during the commission or attempted commission of a knowing or intentional taking of property . . .

and/or

3. [Has] been convicted of the murder of John Rease and 

Henrietta Rease.

(T.R. at 167A.)  Because all of these aggravating factors relate directly and solely to facts present at the time of the crimes, the psychological questionnaire could not have been used by the judge in considering or weighing these aggravators.  The answers given by Williams in that document were completely irrelevant to whether any of the three charged factors existed in fact.  We further note, as fully discussed in our opinion on direct appeal, that there was substantial evidence proving all three aggravating factors beyond a reasonable doubt.  
Rouster
, 600 N.E.2d at 1350.

The existence of the third aggravating factor is plain:  Williams was convicted of killing more than one person, namely John Rease and Henrietta Rease.  The evidence also supports the conclusion that Williams intentionally killed the Reases while engaging or attempting to engage in a robbery even considered in light of the requirement that accomplice liability is not enough, that the defendant must be individually culpable for the death of the victim or victims.
(footnote: 11)  
Townsend v. State
, 533 N.E.2d 1215 (Ind. 1989), 
cert. denied
, 494 U.S. 1020 (1990).  Here, this intent is proven by facts which show that Williams and Rouster acted as a team in robbing and then killing the Reases.  The mitigating factors which were presented by Williams do not overcome the weight of these aggravators.  Because the three aggravating factors against Williams were proven by the State beyond a reasonable doubt, and because the mitigating evidence presented by Williams is outweighed by these aggravating factors beyond a reasonable doubt, Williams' sentence stands as it is.

IV.  Errors of Fact in Our Direct Appeal Opinion

Williams urges that a number of factual errors were made in this Court's decision on direct appeal.  The post-conviction court agreed that the direct appeal opinion erroneously stated that Williams was wearing a blue shirt when he was wearing a red one; that several rooms had been ransacked when only one had been; and that "watches" were found in Williams' pouch when Williams was actually wearing one watch, another watch was in his pouch, and a watch which belonged to one of the victims was found in Teresa Newsome's purse.  (P-C.R. at 1337-39.)  We regret these errors, but they made no difference in our decision on appeal.  

V.  Post-Conviction Due Process

Williams objects to the post-conviction court's exclusion of four experts he sought to present as witnesses:  a forensic social worker, a nurse, and two attorneys.  The forensic social worker's report and deposition testimony concerned what facts and testimony counsel might have been able to obtain from a mitigation expert.  The nurse's report concerned possible consequences of birth complications allegedly reflected in Williams' medical records.  The two attorneys were to testify about lawyer performance.

Expert opinion is appropriate only when it concerns matters not within the common knowledge or experience of an ordinary person and when it would aid the jury.  
Byrd v. State
, 593 N.E.2d 1183, 1185 (Ind. 1992).  Admission of expert testimony is generally assigned to the discretion of the trial court; it is reviewed on appeal only for an abuse of discretion.  
Id.
  Here, the post-conviction court did not abuse its discretion in rejecting the testimony of the two attorneys since the magistrate and the judge are necessarily very familiar with ineffective assistance of counsel claims.  The State objected to the introduction of the nurse's testimony on grounds that Williams himself had not proven that he personally suffered from any of the potential conditions discussed in the nurse's report.  Again, the court did not abuse its discretion in not allowing such testimony.  The court sustained the State's objection that the evidence offered by the social worker on behalf of Williams was cumulative.  Given the large amount of evidence already available on Williams' difficult childhood, we find this was not an abuse of discretion.           

Conclusion

We affirm the judgment of the post-conviction court.

Dickson, Sullivan, Selby, and Boehm, JJ., concur.

FOOTNOTES
1: While this case has been pending, we decided that claims of trial counsel ineffectiveness may be raised in collateral proceedings.  
Woods v. State
, 701 N.E.2d 1208 (Ind. 1998).

2: In analyzing Williams' claims, we note that the Supreme Court has specifically addressed how the 
Strickland
 standard should be applied with regard to a defendant's challenge to his conviction and to his sentence of death.  

When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.  When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

Strickland
, 466 U.S. at 695. 

3: Williams also asserts his appellate counsel were ineffective for failing to argue that his due process rights were violated when possible jury members saw him in blue dungarees at the beginning of voir dire.  Williams' due process claim is waived since it was available but not raised on direct appeal.  
Weatherford
, 619 N.E.2d at 917.  Williams recasts the issue as a matter of ineffective assistance of appellate counsel.  However, Williams was not prejudiced by his appellate counsels' failure to raise the issue since he has not shown the dungarees were readily identifiable as jail garb.  
Shackelford v. State
, 498 N.E.2d 382, 384 (Ind. 1986).  Williams points to the trial judge's statement, "We have a clothing problem," as indicating the clothing was readily identifiable as jail clothing.  However, a judge is familiar with institutional-style clothing while many lay persons are not.  There is no evidence on the record that the clothes Williams wore had writing on them indicating they were jail clothing.  The fact that Williams was seen in such clothing only briefly by possible jurors does not persuade us that Williams was prejudiced by counsel's failure to raise the clothing issue on appeal.

4: Williams' chain of custody argument is not available to him for purposes of showing ineffective trial representation.  Trial counsel actually objected to the blood evidence on grounds of insufficient chain of custody at trial.  (T.R. at 1954-60.)  

5: Indeed, both Rouster and Williams were convicted of two counts of felony murder.  
Rouster
, 600 N.E.2d at 1344.

6: On direct appeal, Williams claimed the State's use of his past criminal conduct was unconstitutional because he had not been convicted of the conduct asserted by the State--the armed robbery of a seventy-one year old man.  
Rouster
, 600 N.E.2d at 1348.  We held that because mitigating factors need only to be proven by the defendant by a preponderance of the evidence rather than beyond a reasonable doubt, the burden placed on Williams by the State's argument was not unconstitutional.  
Id.
        

7: Under our current death penalty sentencing statute, courts should instruct the jury on the potential for consecutive or concurrent sentencing, and the court's failure to provide the jury with a verdict form which included the possibility of sentencing a defendant to life imprisonment without parole would have been error.  Ind. Code Ann. § 35-50-2-9 (d),(e) (West Supp. 1998).  Because Rouster committed his crime on August 12, 1986, however, the law which was in force on that date applies to him.  It is a well established rule of our criminal jurisprudence that the law which applies is that law in effect at the time the crime is committed.  
Smith v. State
, 675 N.E.2d 693, 695 (Ind. 1996); 
see also
 Act of April 7, 1987, Pub. L. No. 332-1987, § 3, 1987 Ind. Acts 3040, 3043 (amending Ind. Code § 35-50-2-9 but stating, "[t]his act does not apply to a case in which a death sentence has been imposed before September 1, 1987.").        

8: The questionnaire used by Judge Letsinger is three pages long and its questions are modeled after the Minnesota Multiphasic Personality Inventory.  It asks for yes or no responses to assertions such as:  "It would be better if almost all laws were thrown away,"  "My hardest battles are with myself,"  and "I am certainly lacking in self-confidence."  (
See
 Appendix to Appellant's Br. at A-80 to A-82.)

9: The questions asked of Judge Letsinger and his answers relevant to our opinion are as follows:

Question 1:  Did you review a questionnaire that was completed by Darnell Williams in connection with Lake Superior Cause No. 45G02-133-886-531?

Answer:  Yes.

. . . .

Question 3:  Did you rely on Williams' responses to the questionnaire when sentencing him?  If so, please explain.

Answer: It is difficult to reproduce thought processes which are over nine (9) years old.  I do not think I relied on any one answer or series of answers.  If I had relied on any answer in the questionnaire, I would have specifically noted the same in my written findings.  There was no such notation.

Question 5:  Was a copy of the completed questionnaire (sic) to Williams or his counsel?  If so, please state when and to whom.

Answer:  Yes.  The questionnaire is an exhibit to the pre-sentence investigation report.  Whenever counsel for the defendant received his copy of the pre-sentence, which is usually one (1) or two (2) days before sentencing, he got a copy of the questionnaire. 

(Appendix to Appellant's Br. at A-78 to A-79.)

     

10: Williams asserts his rights were violated under article 1 section 13 and article 1, section 16 of the Indiana Constitution but he provides us with no argument.  Accordingly, these claims are waived.  
See
 Ind. Appellate Rule 8.3(A)(7).

11: For capital punishment to be precluded under the Eighth Amendment, it must be the case that the defendant neither took a life, attempted to take a life, nor intended to take a life.  
Enmund v. Florida
, 458 U.S. 782 (1982).  Major participation in a felony committed combined with reckless indifference to human life is sufficient to satisfy the 
Enmund
 culpability requirement.  
Tison v. Arizona
, 481 U.S. 137 (1987).