## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 30 2015, 9:19 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

John Pinnow
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Eric P. Babbs
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Anthony D. Moore,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent*

April 30, 2015

Court of Appeals Case No. 45A05-1412-PC-554

Appeal from the Lake Superior Court
The Honorable Clarence D. Murray, Judge
The Honorable Kathleen Sullivan, Magistrate
Lower Court Cause No. 45G02-1302-PC-1

**Bradford, Judge.**

# Case Summary

[1]     In 2011, Appellant-Petitioner Anthony D. Moore was convicted of the murder of Isaiah Claxton. His conviction was affirmed on direct appeal. Moore subsequently filed a petition for post-conviction relief ("PCR"), in which he alleged that the State withheld material impeachment evidence relating to one of the State's witnesses in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Moore also alleged that he suffered ineffective assistance of trial counsel. Following an evidentiary hearing, the post-conviction court denied Moore's petition. Moore appealed this determination.

[2]     On appeal, Moore again alleges that the State withheld evidence in violation of *Brady* and that he received ineffective assistance of trial counsel. Concluding that Moore has failed to establish that the State withheld material evidence or that he received ineffective assistance of trial counsel, we affirm.

# Facts and Procedural History

[3]     Our opinion in Moore's prior direct appeal, which was handed down on May 25, 2012, instructs us as to the underlying facts and procedural history leading to this post-conviction appeal:

> On October 16, 2009, [Moore] returned to his Gary, Indiana residence and discovered that it had been burglarized. He contacted his girlfriend, Carla Dawson ("Dawson"), who came home from work and called the Gary Police Department.
>
> [Moore] began to voice his suspicions that [Claxton], Bernard Hamilton ("Hamilton"), and Chris Martin ("Martin") were the burglars. He went to the home of Martin's cousin, making an offer that "everything will go away" if Martin and his companions would return the stolen items. (Tr. 523.) [Moore] went back home to wait

for the police to arrive, and Claxton came to the residence to buy marijuana.

Claxton waited on the living room sofa while [Moore] paced back and forth, in and out of the residence, talking with some men on the porch, and becoming more and more agitated. At one point, Claxton attempted to leave but [Moore]'s friend asserted that this made Claxton "look guilty." (Tr. 539.) [Moore] went into another room, talked with a friend, and returned with a gun. He then fired nine shots into Claxton, saying "over kill, [b****]." (Tr. 545.)

Claxton's sister and her friend were attempting to reach [Moore] on his cell phone when they overheard shots. [Moore] answered the cell phone and said, "This [b****] a[**] n—— want to steal from me. Now he laying down." (Tr. 145.) [Moore] went outside, still holding his weapon, and left in his vehicle. Claxton died in the doorway of [Moore]'s home.

Later that morning, [Moore]'s stepfather contacted police to arrange for [Moore]'s surrender. He was charged with murder, and his jury trial commenced on March 14, 2011. At the conclusion of the trial, [Moore] was found guilty as charged. He was sentenced to fifty-five years imprisonment.

*Dorelle-Moore v. State*, 968 N.E.2d 287, 288-89 (Ind. Ct. App. 2012).[1] Moore's conviction was affirmed on direct appeal. *See id.* at 288, 291.

[4] On February 11, 2013, Moore filed a *pro-se* PCR petition. Moore, by counsel, filed an amended PCR petition on September 10, 2013. The post-conviction court conducted an evidentiary hearing on October 22, 2013. On November

---

[1] Moore apparently referred to himself as "Anthony Dorelle-Moore" on direct appeal. He refers to himself as "Anthony D. Moore" in the instant appeal.

19, 2014, the post-conviction court issued an order denying Moore's request for PCR.

# Discussion and Decision

[5] Post-conviction procedures do not afford the petitioner with a super-appeal. *Williams v. State*, 706 N.E.2d 149, 153 (Ind. 1999). Instead, they create a narrow remedy for subsequent collateral challenges to convictions, challenges which must be based on grounds enumerated in the post-conviction rules. *Id*. A petitioner who has been denied post-conviction relief appeals from a negative judgment and as a result, faces a rigorous standard of review on appeal. *Dewitt v. State*, 755 N.E.2d 167, 169 (Ind. 2001); *Collier v. State*, 715 N.E.2d 940, 942 (Ind. Ct. App. 1999), *trans. denied*.

[6] Post-conviction proceedings are civil in nature. *Stevens v. State*, 770 N.E.2d 739, 745 (Ind. 2002). Therefore, in order to prevail, a petitioner must establish his claims by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); *Stevens*, 770 N.E.2d at 745. When appealing from the denial of a PCR petition, a petitioner must convince this court that the evidence, taken as a whole, "leads unmistakably to a conclusion opposite that reached by the post-conviction court." *Stevens*, 770 N.E.2d at 745. "It is only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion, that its decision will be disturbed as contrary to law." *Godby v. State*, 809 N.E.2d 480, 482 (Ind. Ct. App. 2004), *trans. denied*. The post-conviction court is the sole judge of the weight of the evidence and the

credibility of the witnesses. *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004). We therefore accept the post-conviction court's findings of fact unless they are clearly erroneous but give no deference to its conclusions of law. *Id.*

[7] Moore contends that the post-conviction court erred in denying his PCR petition, claiming that the record demonstrates that the State withheld material evidence in violation of *Brady*. Moore also claims that he received ineffective assistance of trial counsel. We will discuss each claim in turn.

# I. *Brady* Violation

[8] In [*Brady*], the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." [373 U.S. at 87]. "To prevail on a *Brady* claim, a defendant must establish: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." *Minnick v. State*, 698 N.E.2d 745, 755 (Ind. 1998) (citing *Brady*, 373 U.S. at 87, 83 S. Ct. 1194), *cert. denied*, 528 U.S. 1006, 120 S. Ct. 501, 145 L.Ed.2d 387 (1999). Evidence is material under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L.Ed.2d 481 (1985). However, the State will not be found to have suppressed material evidence if it was available to a defendant through the exercise of reasonable diligence. *Conner v. State*, 711 N.E.2d 1238, 1246 (Ind. 1999), *cert. denied*, 531 U.S. 829, 121 S. Ct. 81, 148 L.Ed.2d 43 (2000). "Favorable evidence" includes both exculpatory evidence and impeachment evidence. *See Prewitt v. State*, 819 N.E.2d 393, 401 (Ind. Ct. App. 2004), *trans. denied*. Suppression of *Brady* evidence is constitutional error warranting a new trial. *Turney v. State*, 759 N.E.2d 671, 675 (Ind. Ct. App. 2001), *trans. denied*.

*Bunch v. State*, 964 N.E.2d 274, 297-98 (Ind. Ct. App. 2012).

[9] In arguing that the State committed a *Brady* violation, Moore asserts that the State failed to disclose to defense counsel that its witness, Anon Burnett, had a prior conviction for conversion. The State, for its part, acknowledges that Burnett's prior conviction for conversion qualified as impeachment evidence. The State also acknowledges that it inadvertently failed to disclose this evidence to Moore's counsel. The State argues, however, that the PCR court correctly determined that Moore failed to prove that the evidence of Burnett's prior conviction was material to an issue at trial.

[10] The record demonstrates that on September 8, 2010, defense counsel deposed Burnett. During this deposition, the following exchange occurred:

> [Defense Counsel]: Okay. Do you have any criminal history? Have you ever been convicted of a crime?
>
> [Burnett]: Well, I'll just tell you one or two things that - - or I can say, but as of now it is not on my record so I can't say, so I think not.
>
> The first one was a disorderly conduct. They told me if I waited six months and I stayed out of trouble they will wipe it off, so I stayed out of trouble for more than six months and that should be gone.
>
> And the second act that was against me was helping a lady going in the store because she was taking all day and something just spased [sic] out on my head; and I just took her money out of her hand; but after five minutes of running, I don't know, whatever was in my head just told me that I should give it back because I wouldn't want nobody robbing from my mother or grandmother, so I gave it back to her; therefore I spent 14 days or three days in Lake Station, and the rest was in Lake County.

> And they wanted to go to court, but the judge said I could talk to the lady; and after the 14 days I was released on my own recognizance, so that's all on my record.
>
> [Defense Counsel]: Okay. Did they dismiss that case; do you know?
>
> [Burnett]: I had one year of probation and after - - and community service, so its gone as of January.

PCR Ex. 3, pp. 6-7.

[11] Again, the "State will not be found to have suppressed material evidence if it was available to a defendant through the exercise of reasonable diligence." *Id.* at 297 (internal citation omitted). Here, during Burnett's deposition, Burnett divulged to defense counsel that he had served approximately 14 days in jail and one year on probation for taking money out of a lady's hand. Burnett's answer in this regard was sufficient to put defense counsel on notice that Burnett might have an impeachable conviction. Defense counsel chose not to explore this potential impeachable conviction further or to question Burnett about this conviction during trial. Because the evidence of Burnett's prior conversion conviction was available to the defendant through the exercise of reasonable diligence, we cannot say that the State suppressed evidence in question. *See Bunch*, 964 N.E.2d at 297 (citing *Conner*, 711 N.E.2d at 1246).

[12] Furthermore, even if the State was found to have suppressed the evidence in question, we agree with the trial court's determination that Moore failed to prove that the challenged evidence was material to an issue at trial. Again, "[e]vidence is material under *Brady* 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding

would have been different.'" *Id*. (quoting *Bagley*, 473 U.S. at 682). "'A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.'" *Id*. (quoting *Bagley*, 473 U.S. at 682).

[13] We have previously held that the importance of impeachment evidence depends on the facts of the particular case. *See Gibson v. State*, 514 N.E.2d 318, 321 (Ind. Ct. App. 1987). In reaching this holding, we have explained that the "'importance of such evidence will depend upon the type of impeachment evidence it is, the extent of its impeachment, and the importance of the impeached witness to the State's case.'" *Id*. (quoting *Deatrick v. State*, 181 Ind. App. 469, 475, 392 N.E.2d 498, 502 (1979)). Considerations appropriate to this determination include: (1) whether the suppressed information was substantially inconsistent with the witness's trial testimony; (2) whether the suppressed information would have refuted an element of the offense or whether it would have served only to impeach the general veracity of the witness; (3) whether the witness making the suppressed statement was otherwise impeached; (4) whether the witness's trial testimony regarding elemental facts was corroborated by other witnesses; and (5) whether the defense had access to other pre-trial statements of the witness not claimed to be inconsistent with the suppressed statement. *Id*.

[14] At trial, Burnett testified that on the day in question, Moore and his girlfriend, Carla, were living together at a house in an area of Gary known as Marshalltown. Burnett testified that he considered Moore to be a friend and that he saw Moore "every day." Trial Tr. p. 521. On the morning of October

16, 2009, Moore came to Burnett's home and told Burnett that he "just got robbed, man, somebody broke into [his] crib." Trial Tr. p. 523. Moore believed that Burnett's cousin, Chris Martin, was involved in the burglary and told Burnett "tell your cousin to bring everything back, it will all go away." Trial Tr. p. 523. Burnett subsequently left his home with Moore. The two men eventually ended up at Moore's home.

[15] At some point, Moore spoke with Claxton. Claxton told Moore that he "didn't know anything" about the robbery. Trial Tr. p. 535. Claxton later came to Moore's home to purchase $20.00 worth of marijuana from Moore.

[16] While Claxton was at Moore's home, Moore and Carla went to another room to talk. Moore eventually emerged from the room looking upset and holding a gun. Moore exchanged a few words with Claxton, who had been looking at something on his phone, before shooting Claxton. Moore then walked by Claxton; told Claxton "over kill, b[****];" and walked out the door, still holding the gun. Trial Tr. p. 545. Burnett testified that he was "shocked" to have seen Moore shoot Claxton. Trial Tr. p. 546.

[17] Claxton's sister, Sherita, testified that in October of 2009, she and Claxton lived "about five houses down" from Moore. Trial Tr. p. 97. On the morning that Claxton was killed, Sherita and her friend, Ashley, awoke to find that Ashley had missed several phone calls from Moore. As Ashley was attempting to return Moore's call, Sherita and Ashley heard gun shots. Moore then answered the phone and said, "this [b****] a[**] n— want to steal from me. Now he

laying down." Trial Tr. p. 145. After hearing the gun shots, Sherita and Ashley walked outside. As to what happened next, Sherita testified that:

> So by the time I got to the end of the driveway, I see, I think, about seven guys running down the street, so I'm asking him what's going on, what's going on. And they not telling me. And they doing that. So when I got to the end of the driveway, I seen my brother car was parked down there, and I see [Moore] standing with a gun leaning on the white truck. So he jumps in the car and the car pulled off, but we on our way down there, and then I see - - once I got to the front of the house, I seen my brother, you know, laying right from the doorway.

Trial Tr. pp. 107-08. Sherita then ran back to her house and called 911.

[18]     Ashley also testified that after hearing gunshots, she saw Moore "running out of the house." Trial Tr. p. 147. Moore got into the passenger side of a white Expedition, which then drove away. Ashely observed that the Expedition was being driven by Moore's girlfriend's younger brother, Corey.

[19]     In addition, Claxton's other sister, Cassandra, was at Sherita's home on the morning in question and heard the gun shots. Cassandra testified that after hearing the gun shots, she observed Moore, who appeared to be holding a gun, walk out of the house and get into the passenger side of a white truck-like vehicle. As the vehicle drove away, Cassandra observed that Corey was driving the vehicle.

[20]     Jeffrey Little, a friend of Corey's who was riding with Corey in the white Expedition on the morning in question, testified that he and Corey went to the home where Moore and Corey's sister lived. After arriving at the home, Little

heard gun shots.  Little then saw Moore come out of the home holding what "looked like a gun."  Trial Tr. p. 430.  Little then ran away from the home.

[21]  Furthermore, defense counsel testified during the PCR evidentiary hearing that his goal was to suggest that Burnett "could not be believed because, to use a vernacular, [he] was crazy."  PCR Tr. p. 20.  With respect to whether defense counsel would have attempted to impeach Burnett by questioning Burnett about his potential impeachable prior conversion conviction, defense counsel stated the following:

> It's likely I would have.  Not completely sure … I'm not one hundred percent sure about conversion, but it's a reasonable likelihood that I would have.
>
> I mean, I - - I'm not a big believer in those in many cases.  I mean, if a witness has been given benefit from the State for their testimony … then I know I always do, because I get the benefit of the impact on credibility directly for the conviction; but also it's a mechanism by which the jury can be educated as to various sentences that apply, many times to the charges, even the defendant is charged with.
>
> Standing alone as a conviction, I would say I would normally do it, but I just don't have any specific recall here.  What I - - based on everything I seen, all I have to go on about a conviction was pages six through whatever of the deposition that we've already talked about.

PCR Tr. pp. 20-21.  After giving this statement, defense counsel went on to state:

> I don't always [impeach witness with prior convictions].  The best way to say it is I don't automatically use that standing alone.  I mean, I want to have a reason.  It's witness by witness.  If I think - - some witnesses you approach, you don't want to get them angry.  They respond better to thinking you're being nice to them and you get better answers out of them.  So it's not automatic for me.

> In this case, given his description of [his prior conversion conviction] in the deposition, if I had evidence that it was actually a conviction, I might have used it, not so much for the impeaching affect [sic] of the existence of the confession - - of the conviction itself, but to challenge him giving a description.

> I mean, if he was just flat out convicted, and here he is trying to soft soap it, right, trying to suggest, which he does, that it's not really a conviction and wasn't really his fault, and all of that, yeah, then I might have used it for that purpose. As opposed to simply, "You can't be believed because, once you shoplift, you committed an act of conversion."

PCR Tr. pp. 22-23. Defense counsel indicated that he felt that he "made some headway" in regards to challenging Burnett's credibility by questions regarding his mental health. PCR Tr. p. 23.

[22] Here, the challenged evidence was not inconsistent with Burnett's trial testimony. It would not have refuted an element of the charged offense but rather would have served only to impeach Burnett's general veracity. Defense counsel chose a different avenue, *i.e.*, Burnett's mental health issues, to impeach his credibility. Further, although Burnett's testimony was important to the State's case, his testimony was corroborated by the testimony of other witnesses. As such, we cannot say that there is a reasonable probability, *i.e.*, a probability sufficient to undermine our confidence in the outcome of Moore's trial, that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *See Bunch*, 964 N.E.2d at 297. Accordingly, we conclude that the post-conviction court did not err in reaching this same determination.

# II. Ineffective Assistance of Counsel

[23] The right to effective counsel is rooted in the Sixth Amendment to the United States Constitution. *Taylor v. State*, 840 N.E.2d 324, 331 (Ind. 2006). "'The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 685 (1984)). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper function of the adversarial process that the trial court cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

[24] A successful claim for ineffective assistance of counsel must satisfy two components. *Reed v. State*, 866 N.E.2d 767, 769 (Ind. 2007). Under the first prong, the petitioner must establish that counsel's performance was deficient by demonstrating that counsel's representation "fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the 'counsel' guaranteed by the Sixth Amendment." *Id.* We recognize that even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or most effective way to represent a client, and therefore, under this prong, we will assume that counsel performed adequately and defer to counsel's strategic and tactical decisions. *Smith v. State*, 765 N.E.2d 578, 585 (Ind. 2002). Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. *Id.*

[25] Under the second prong, the petitioner must show that the deficient performance resulted in prejudice. *Reed*, 866 N.E.2d at 769. Again, a petitioner may show prejudice by demonstrating that there is "a reasonable probability (*i.e.* a probability sufficient to undermine confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different." *Id.* A petitioner's failure to satisfy either prong will cause the ineffective assistance of counsel claim to fail. *See Williams*, 706 N.E.2d at 154. Stated differently, "[a]lthough the two parts of the *Strickland* test are separate inquires, a claim may be disposed of on either prong." *Grinstead v. State*, 845 N.E.2d 1027, 1031 (Ind. 2006) (citing *Williams*, 706 N.E.2d at 154).

[26] Moore argues that his trial counsel provided ineffective assistance by failing to make a reasonable inquiry into Burnett's criminal history. Specifically, Moore claims that Burnett's statements during his deposition should have put trial counsel on notice of Burnett's prior conversion conviction, that trial counsel should have investigated this prior conviction, and used it to impeach Burnett during trial. For its part, the State asserts that Moore's trial counsel did not provide Moore with ineffective assistance.

[27] Again, we concluded above that Moore failed to prove that there was a reasonable probability that the result of the proceedings would have been different had the evidence been disclosed to the defense. Likewise, given the overwhelming evidence of Moore's guilt, we conclude that Moore also failed to prove that there was a reasonable probability that the result of the proceedings

would have been different had defense counsel attempted to impeach Burnett by questioning him about his prior conversion conviction.

[28] Moore does not dispute the fact that he shot Claxton. As is described in detail above, the record demonstrates that multiple witnesses testified that after hearing gun shots, they observed Moore exit the house while holding a gun. In addition, multiple witnesses testified that Moore used callous language when speaking to and about Claxton both immediately prior to and immediately after Moore shot Claxton.

[29] In light of the overwhelming evidence of Moore's guilt, we conclude that Moore has failed to prove that trial counsel's allegedly deficient act of failing to attempt to impeach Burnett by questioning him about his prior conversion conviction resulted in prejudice to Moore. Furthermore, because Moore has failed to prove that he was prejudiced by trial counsel's conduct, we need not determine whether Moore presented sufficient evidence to prove that trial counsel provided deficient performance. *See Grinstead*, 845 N.E.2d at 1031 (providing that "[a]lthough the two parts of the Strickland test are separate inquiries, a claim may be disposed on either prong"); *Williams*, 706 N.E.2d at 154 (providing that a petitioner's failure to satisfy either prong will cause his ineffective assistance of counsel claim to fail). Having concluded that Moore failed to prove that he was prejudiced by his counsel's performance, we further conclude that the post-conviction court did not err in denying Moore's PCR petition.

[30]     The judgment of the post-conviction court is affirmed.

Vaidik, C.J., and Kirsch, J., concur.