**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

May 23 2013, 8:19 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**STEPHEN T. OWENS**
Public Defender of Indiana

**KEVIN R. HEWLATE**
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**IAN McLEAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

SAMUEL FANCHER,                     )
                                    )
    Appellant-Petitioner,           )
                                    )
        vs.                      )     No. 49A02-1210-PC-790
                                    )
STATE OF INDIANA,                   )
                                    )
    Appellee-Respondent.            )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Kurt M. Eisgruber, Judge
The Honorable Steven J. Rubick, Magistrate
Cause No. 49G01-0805-PC-107656

**May 23, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

Appellant-Petitioner Samuel Fancher was convicted of murder, Class A felony attempted murder, Class B felony criminal confinement, and Class A misdemeanor carrying a handgun without a license. Fancher's convictions were affirmed on direct appeal. Fancher sought post-conviction relief, arguing that he received ineffective assistance of trial counsel. Fancher now appeals from the denial of his petition for post-conviction relief. Concluding that Fancher did not receive ineffective assistance of trial counsel, we affirm.

## FACTS AND PROCEDURAL HISTORY

Our opinion in Fancher's direct appeal instructs us as to the underlying facts leading to this post-conviction appeal:

> The evidence most favorable to Fancher's convictions is as follows. On July 30, 2007, seventeen-year-old Leroy Moorman (Moorman) was driving in Indianapolis, Indiana, with his friend, Ryan Sampson (Sampson). As they left a gas station, Moorman noticed a white Ford Crown Victoria pulling into the station. While returning to Moorman's home on Dearborn Street, the boys encountered a second white Ford Crown Victoria, this one with custom rims. The driver pulled alongside Moorman's vehicle and asked him if he wanted to sell it. Moorman said that he did and then continued to the alley behind his house. The second Crown Victoria pulled in behind him. As Sampson and Moorman exited their vehicle, some men from the second Crown Victoria approached them with guns. Moorman was hit on the head and fell down, while Sampson fought with the men. Sampson and Moorman were eventually forced into the back seat of the second Crown Victoria at gunpoint and driven away.
>
> Moorman's younger brother was in the house when the cars pulled into the alley. He heard the cars and looked out a window. He saw Moorman's car and a white car "with rims." (Transcript p. 56). He heard one of the men say, "I heard y'all broke in my house[.]" (Tr. p. 55). He went outside and saw one of the men standing over his brother. He then went back to the house and told his aunt what was going on, and she called the police.
>
> As the second Crown Victoria drove away from the house, Moorman and Sampson began asking questions about why they were forced into the car. The men's responses gave Moorman the "general feeling ... that [they] were being accused of something." (Tr. p. 107). The Crown Victoria stopped at an

2

abandoned house on Gale Street. Moorman and Sampson were led into the house at gunpoint and then directed into a bathroom. Moorman and Sampson were asked where "certain items" were. (Tr. p. 83). Moorman and Sampson were then shot. Moorman survived after being shot in both arms and playing dead, but Sampson was killed by several gunshots, including two to the back of the head that were "instantly fatal." (Tr. p. 148). Police later recovered parts of five bullets, all which were in the .38 caliber class.

Indianapolis Metropolitan Police Department (IMPD) Officer Kerry Morse (Officer Morse) was dispatched to the Dearborn Street house on a report of a "[p]ossible abduction." (Tr. p. 29). He was given a description of a white Ford Crown Victoria "with custom wheels." (Tr. p. 32). Officer Morse "put out a broadcast" giving the description of that car. (Tr. p. 33). While Officer Morse was at the Dearborn Street house, he learned that a shooting had occurred on Gale Street. On his way to Gale Street, Officer Morse saw a white Crown Victoria and pulled it over. Tia Griffin (Griffin), the mother of Fancher's son, was driving the car. Officer Morse questioned Griffin, then released her.

Meanwhile, IMPD Officer Bryan Sosbe (Officer Sosbe) saw a vehicle matching the description given by Officer Morse and pulled it over. Derrick Williams, who Moorman later identified in a photo array as one of the men involved in the abduction, was driving the car. Moorman's younger brother was brought to the scene and said that the vehicle "looked like the car" that had been behind his house. (Tr. p. 59). As such, Officer Sosbe had the car towed and impounded.

During the ensuing investigation, police found the fingerprints of Fancher, Jerry Emerson (Emerson), and Moorman's younger brother on the impounded car. The car was registered to Kara Black, with whom Emerson has several children. Emerson's fingerprints were also found on Moorman's car. In addition, IMPD Detective Tom Tudor (Detective Tudor) showed Moorman several photo arrays and asked him if he recognized any of the men involved in the abduction and shootings. Moorman identified Fancher and Emerson as the men who had been in the bathroom when Moorman and Sampson were shot.

Timothy Spears (Spears), a firearm examiner with the Indianapolis-Marion County Forensic Services Agency, examined the bullet fragments that were recovered from the Gale Street house. He determined that two of the bullets were fired from one .38 caliber gun and that two others were also fired from one .38 caliber gun. However, Spears could not determine whether all four were fired from the same gun. The fifth bullet was also in the .38 caliber class, but it "did not have enough individual characteristics" for Spears to determine whether it had been fired from the same gun as any of the other bullets. (Tr. p. 242).

3

In March of 2008, police investigating a separate matter obtained a search warrant for a Bloomington, Indiana, motel room occupied by Fancher and Coy Daniels (Daniels). One day, shortly after seeing Fancher leave the motel, officers moved in and executed the warrant while Daniels was alone in the room. The officers found a .38 caliber handgun. Spears examined the gun and observed that "in the barrel area there was some marks that didn't appear to be consistent with rifling marks that ran perpendicular to what—the rifling rounds." (Tr. p. 244). Spears opined that the marks could have been made intentionally by using a tool. Spears was unable to determine whether the gun recovered from the motel room had fired any of the bullets found after Sampson and Moorman were shot. According to Spears, "it's possible" that the marks inside the gun could affect one's "ability to make an identification on the bullets[.]" (Tr. p. 247).

Also in early 2008, police began talking with Curtis Williams (Williams), Sampson's cousin. Williams claimed to have information on the shootings. Williams was in federal custody on a drug charge for which he faced a sentence of ten years to life. In exchange for a plea agreement limiting his sentence to ten years, Williams agreed to provide, among other things, the information he had regarding the shootings of Moorman and Sampson.

According to Williams, both Fancher and Emerson drove white Ford Crown Victorias. One day in the summer of 2007, Williams saw the Crown Victorias, one behind the other, while at a friend's house. Griffin was driving the first Crown Victoria with Emerson in the passenger seat. Emerson told Williams that he "needed to holler at [Williams] ... when he's done handling somethin'." (Tr. p. 190). Because Williams knew that Griffin was Fancher's girlfriend, he asked where Fancher was. Fancher then leaned up from the back seat and said, "[W]hat'sup?" (Tr. p. 191). Williams could see that there were two other males in the back seat of the car, and he heard "screaming" and "commotion" in the back seat and saw that the car was shaking. (Tr. pp. 192, 219). When Williams asked about the commotion, Emerson tapped Griffin on the leg, and Griffin drove away.

Shortly after his encounter with Fancher and Emerson, Williams heard from family members that Sampson had been killed. Later, Williams was driving and saw Fancher and Emerson, and he pulled over to talk to them. Williams said, "I heard somebody broke in yall trap." (Tr. pp. 195-96). Fancher responded that "some little dudes did it." (Tr. p. 196). According to Williams, the conversation proceeded as follows:

> [Emerson] said cuz, n* * * *, we seen them on camera. He said
> one of them little n* * * * * even had the nerve to try to fight.
> He said as soon as we got that n* * * * in—in the house, we hit
> that n* * * * down on the top of the head, and he said [Fancher]
> was goin' to do the same thing—he said this b* * * * goin' to do

4

the same thing, he goin' to get him up for the body shot.
* * * *
He said he hit the n* * * * in the head and he said [Fancher] was supposed to get the other one in the head. He said this b* * * * want to get him up for the body shot. I told him body shots didn't work. [Fancher] said, b* * * *, you seen him laying there. You thought he was dead, too.

(Tr. pp. 198-99). At that point, Emerson "started back up" and said to Williams, "[W]hy you always askin' me questions?" (Tr. p. 199). "[A]fter the fact," Williams realized that Fancher and Emerson were talking about killing Sampson. (Tr. p. 201).

*Fancher v. State*, 49A02-0901-CR-35 slip op. pp. 1-3 (Ind. Ct. App. August 17, 2009).

On May 12, 2008, the State charged Fancher with murder, a felony, Class A felony attempted murder, Class B felony criminal confinement, and Class A misdemeanor carrying a handgun without a license. *Id*. at p. 3. Following a bench trial on November 10 and 12, 2008, the trial court found Fancher guilty as charged.[1] *Id*. On December 16, 2008, the trial court sentenced Fancher to an eighty-five-year term of incarceration. *Id*. Fancher subsequently filed a notice of appeal. In Fancher's direct appeal, this court affirmed the judgment of the trial court, concluding that "the State presented sufficient evidence to support all four of Fancher's convictions." *Id*. at 8.

On August 4, 2010, Fancher filed a *pro se* petition for post-conviction relief ("PCR"). On March 23, 2011, Fancher, by counsel, filed an amended PCR petition. The post-conviction court conducted evidentiary hearings on Fancher's amended PCR petition on May 17, 2011, and November 15, 2011. During these hearings, Fancher, by counsel, presented

---

[1] With respect to the murder charge, the trial court found Fancher guilty on a theory of accomplice liability.

5

argument in support of his amended PCR petition. On September 7, 2012, the post-conviction court issued an order denying Fancher's request for PCR. Fancher now appeals.

## DISCUSSION AND DECISION

Post-conviction procedures do not afford the petitioner with a super-appeal. *Williams v. State*, 706 N.E.2d 149, 153 (Ind. 1999). Instead, they create a narrow remedy for subsequent collateral challenges to convictions, challenges which must be based on grounds enumerated in the post-conviction rules. *Id.* A petitioner who has been denied post-conviction relief appeals from a negative judgment and as a result, faces a rigorous standard of review on appeal. *Dewitt v. State*, 755 N.E.2d 167, 169 (Ind. 2001); *Collier v. State*, 715 N.E.2d 940, 942 (Ind. Ct. App. 1999), *trans. denied*.

Post-conviction proceedings are civil in nature. *Stevens v. State*, 770 N.E.2d 739, 745 (Ind. 2002). Therefore, in order to prevail, a petitioner must establish his claims by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); *Stevens*, 770 N.E.2d at 745. When appealing from the denial of a PCR petition, a petitioner must convince this court that the evidence, taken as a whole, "leads unmistakably to a conclusion opposite that reached by the post-conviction court." *Stevens*, 770 N.E.2d at 745. "It is only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion, that its decision will be disturbed as contrary to law." *Godby v. State*, 809 N.E.2d 480, 482 (Ind. Ct. App. 2004), *trans. denied*. The post-conviction court is the sole judge of the weight of the evidence and the credibility of the witnesses. *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004). We therefore accept the post-conviction court's

6

findings of fact unless they are clearly erroneous but give no deference to its conclusions of law. *Id.*

### Ineffective Assistance of Counsel

The right to effective counsel is rooted in the Sixth Amendment to the United States Constitution. *Taylor v. State*, 840 N.E.2d 324, 331 (Ind. 2006). "'The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 685 (1984)). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper function of the adversarial process that the trial court cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

A successful claim for ineffective assistance of counsel must satisfy two components. *Reed v. State*, 866 N.E.2d 767, 769 (Ind. 2007). Under the first prong, the petitioner must establish that counsel's performance was deficient by demonstrating that counsel's representation "fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the 'counsel' guaranteed by the Sixth Amendment." *Id.* We recognize that even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or most effective way to represent a client and therefore under this prong, we will assume that counsel performed adequately, and will defer to counsel's strategic and tactical decisions. *Smith v. State*, 765 N.E.2d 578, 585 (Ind. 2002). Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily

7

render representation ineffective. *Id.*

Under the second prong, the petitioner must show that the deficient performance resulted in prejudice. *Reed*, 866 N.E.2d at 769. A petitioner may show prejudice by demonstrating that there is "a reasonable probability (*i.e.* a probability sufficient to undermine confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different." *Id.* A petitioner's failure to satisfy either prong will cause the ineffective assistance of counsel claim to fail. *See Williams*, 706 N.E.2d at 154. Stated differently, "[a]lthough the two parts of the *Strickland* test are separate inquires, a claim may be disposed of on either prong." *Grinstead v. State*, 845 N.E.2d 1027, 1031 (Ind. 2006) (citing *Williams*, 706 N.E.2d at 154).

Fancher challenges the post-conviction court's determination that his trial counsel was not ineffective. Specifically, Fancher claims that his trial counsel was ineffective for failing to cross-examine Moorman about prior statements or testimony in which Moorman seemed to indicate that Fancher was not the shooter and that Fancher was not present when the shootings occurred. Fancher also claims that his trial counsel should have questioned Moorman on cross-examination about whether a female was in the vehicle when he was abducted. The State argues that the post-conviction court properly denied Fancher relief because his trial counsel made tactical decisions regarding specific questions to ask or topics to cover during counsel's cross-examination of Moorman.

During the evidentiary hearing, trial counsel testified that in preparation for trial, she examined the relevant evidentiary documents, including Moorman's statements to the

investigating officers; visited the crime scene; "went over" discovery materials with Fancher; spoke with Fancher's co-defendant's trial counsel; and developed a theory of defense. PCR Tr. p. 11. This theory of defense was that even if Fancher might have been involved with some parts of the alleged crimes, Fancher "was not the shooter and that he did not know that the shooting was going to occur." PCR Tr. p. 11. Counsel testified that she discussed this theory of defense with Fancher, explained the theory of accomplice liability to Fancher, and explained how the theory of accomplice liability could be a concern for Fancher and his defense. Fancher indicated that he agreed with counsel's suggested theory of defense.

In order to try to raise doubt as to whether Fancher was involved in the shootings, the defense appeared to attempt to discredit Williams, who testified for the State and provided the most damning evidence of Fancher's involvement in the abductions and shootings. Williams identified Fancher as being involved in the shootings, claiming that Fancher and his co-defendant had discussed their involvement in the shootings in front of him. During trial, Fancher's counsel argued that Williams was lying about Fancher's involvement in the crimes. Counsel painted Williams as an individual who had an ulterior motive to lie, and argued that as a result, his testimony was wholly untrustworthy.

Fancher argues that his counsel could have in some way discredited Williams further by questioning Moorman about the identity of the shooter or the presence of a female in the vehicle when he was abducted. Fancher claims that Moorman's answers to these questions could potentially have discredited Williams because the testimony of the victim would be stronger than that of an informant who was not present during the shootings. Fancher does

9

not explain, however, how any statement by Moorman, even if he were to name someone other than Fancher as the shooter, would eliminate the possibility of Fancher's involvement or discredit Williams's testimony that Fancher and his co-defendant had openly discussed their involvement in the shootings in his presence. Moorman did not identify Fancher as the shooter or as being present during the shooting at trial, and his statements to police regarding Fancher's exact involvement in the crimes were inconsistent. Thus, it seems to have been consistent with counsel's proffered theory of defense not to push Moorman for a positive identification of the shooter or those present during the shooting, as any such line of questioning could have elicited answers that would potentially bolster Williams's testimony and weaken, or altogether discredit, the proffered defense theory.

Further, while counsel admitted that she did not remember every question she asked the witnesses, including Moorman, she stated that she believed she asked all necessary questions relating to the proffered theory of defense, which, again, was agreed upon by Fancher. Counsel's decisions about what specific questions to ask witnesses during trial amount to tactical decisions relating to the theory of defense. Again, we defer to counsel's strategic and tactical decisions, and assume that counsel performed adequately. *See Smith*, 765 N.E.2d at 585. As such, we conclude that Fancher cannot establish that he suffered ineffective performance of trial counsel because he has failed to demonstrate that his trial counsel's performance was deficient. *See Reed v. State*, 866 N.E.2d at 769 (providing that in order to prove a claim of ineffective assistance of counsel, petitioner must prove both prongs set forth in *Strickland*, i.e., defective performance and prejudice); *see Grinstead*, 845 N.E.2d

10

at 1031 (providing that a claim of ineffective assistance of counsel can be disposed of on either prong).

The judgment of the post-conviction court is affirmed.

RILEY, J., and BROWN, J., concur.