## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 05 2017, 5:25 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ross G. Thomas
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Leon Benson,<br>*Appellant-Petitioner,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Respondent.* | September 5, 2017<br><br>Court of Appeals Case No.<br>49A04-1604-PC-897<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Marc Rothenberg, Judge<br>The Honorable Amy J. Barbar, Magistrate<br><br>Trial Court Cause No.<br>49G02-9808-PC-134837 |

**Bradford, Judge.**

# Case Summary

[1] In August of 1998, Appellee-Respondent the State of Indiana ("the State") charged Appellant-Petitioner Leon Benson with murder and Class A misdemeanor carrying a handgun without a license. In July of 1999, a jury found Benson guilty as charged. He was subsequently sentenced to an aggregate term of sixty years. On February 15, 2002, the Indiana Supreme Court affirmed Benson's convictions and sentence.

[2] Benson subsequently petitioned for post-conviction relief ("PCR"), arguing that he suffered ineffective assistance of trial counsel and that he should receive a new trial in light of certain newly-discovered evidence. Following a hearing on Benson's petition, the post-conviction court determined that Benson had failed to establish that he suffered ineffective assistance of trial counsel or that the allegedly newly-discovered evidence necessitated a new trial. Benson challenges the post-conviction court's determinations on appeal. We affirm.

# Facts and Procedural History

[3] Kasey Schoen was shot and killed while sitting behind the wheel of his pickup truck during the early morning hours of August 8, 1998.

> The State's key witness, a morning newspaper delivery person, testified that, as she was working her route between 2:30 and 4:00 a.m., she stopped her vehicle to place newspapers in a sidewalk vending box. Ahead of her and illuminated by her headlights she saw a black Dodge Ram truck parked with its driver talking to a man standing on the sidewalk. As she walked

around the front of her vehicle, she heard two or three gunshots from the direction of the truck and looked in its direction, observing the man who had been standing on the sidewalk now walking in her direction. She then observed the man turn and walk back to the truck and fire two more shots into it. She could see the flash coming off the end of the gun in the man's hand. She got into her vehicle, tried to call 911 on her cell telephone, and drove ahead, passing the parked truck and seeing a man slumped over in the seat. As she drove by, the man who fired the shots was walking on the sidewalk and looked at the witness, making eye contact with her, after which he ran into a parking lot.

*Benson v. State*, 762 N.E.2d 748, 750-51 (Ind. 2002). The State's key witness, Christy Schmitt, identified Benson as the shooter from a photo array.

[4]     On August 20, 1998, the State charged Benson with murder and Class A misdemeanor carrying a handgun without a license. Benson's first jury trial resulted in a mistrial as the jury was unable to reach a verdict. His case again proceeded to trial on July 6 through 8, 1999. During trial, Schmitt again identified Benson "as the man who had fired the shots." *Id*. at 751. Another witness, Donald Brooks, also identified Benson as the shooter.[1] At the conclusion of trial, the jury found Benson guilty as charged. He was subsequently sentenced to an aggregate sixty-year term of imprisonment.

---

[1] Brooks testified that he observed Benson approach the truck from a nearby apartment window. Brooks had turned away from the window when he heard four or five gun shots. After hearing the gunshots, he turned back towards the window. When he looked back out the window, he saw Benson walking away from the truck.

Benson's convictions and sentence were affirmed on direct appeal by the Indiana Supreme Court. *Id*. at 756.

[5] Benson first filed a PCR petition on January 24, 2003. He subsequently withdrew this petition, without prejudice. On November 22, 2013, Benson again filed a PCR petition. He filed an amended PCR petition on February 14, 2014.

[6] The post-conviction court conducted a two-day evidentiary hearing on Benson's petition on November 19, 2014, and July 31, 2015. The post-conviction court took the matter under advisement and, on March 28, 2016, issued an order denying Benson's petition. In reaching its decision, the post-conviction court stated the following:

> Defense counsel presented a vigorous and substantial defense to the jury. The State's evidence was rigorously challenged and subjected to close scrutiny. The fact that Petitioner was ultimately convicted does not equate to ineffective assistance of counsel or an unfair trial.

Appellant's App. Vol. III, pp. 61-62. This appeal follows.

# Discussion and Decision

[7] Post-conviction procedures do not afford the petitioner with a super-appeal. *Williams v. State*, 706 N.E.2d 149, 153 (Ind. 1999). Instead, they create a narrow remedy for subsequent collateral challenges to convictions, challenges which must be based on grounds enumerated in the post-conviction rules. *Id*.

A petitioner who has been denied post-conviction relief appeals from a negative judgment and as a result, faces a rigorous standard of review on appeal. *Dewitt v. State*, 755 N.E.2d 167, 169 (Ind. 2001); *Colliar v. State*, 715 N.E.2d 940, 942 (Ind. Ct. App. 1999), *trans. denied*.

[8] Post-conviction proceedings are civil in nature. *Stevens v. State*, 770 N.E.2d 739, 745 (Ind. 2002). Therefore, in order to prevail, a petitioner must establish his claims by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); *Stevens*, 770 N.E.2d at 745. When appealing from the denial of a PCR petition, a petitioner must convince this court that the evidence, taken as a whole, "leads unmistakably to a conclusion opposite that reached by the post-conviction court." *Stevens*, 770 N.E.2d at 745. "It is only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion, that its decision will be disturbed as contrary to law." *Godby v. State*, 809 N.E.2d 480, 482 (Ind. Ct. App. 2004), *trans. denied*. The post-conviction court is the sole judge of the weight of the evidence and the credibility of the witnesses. *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004). We therefore accept the post-conviction court's findings of fact unless they are clearly erroneous but give no deference to its conclusions of law. *Id*.

## I. Ineffective Assistance of Counsel

[9] The right to effective counsel is rooted in the Sixth Amendment to the United States Constitution. *Taylor v. State*, 840 N.E.2d 324, 331 (Ind. 2006). "'The Sixth Amendment recognizes the right to the assistance of counsel because it

envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results.'" *Id*. (quoting *Strickland v. Washington*, 466 U.S. 668, 685 (1984)). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper function of the adversarial process that the trial court cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

[10] A successful claim for ineffective assistance of counsel must satisfy two components. *Reed v. State*, 866 N.E.2d 767, 769 (Ind. 2007). Under the first prong, the petitioner must establish that counsel's performance was deficient by demonstrating that counsel's representation "fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the 'counsel' guaranteed by the Sixth Amendment." *Id*. We recognize that even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or most effective way to represent a client, and therefore, under this prong, we will assume that counsel performed adequately and defer to counsel's strategic and tactical decisions. *Smith v. State*, 765 N.E.2d 578, 585 (Ind. 2002). Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. *Id*.

[11] Under the second prong, the petitioner must show that the deficient performance resulted in prejudice. *Reed*, 866 N.E.2d at 769. Again, a petitioner may show prejudice by demonstrating that there is "a reasonable probability (*i.e.* a probability sufficient to undermine confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different." *Id*.

A petitioner's failure to satisfy either prong will cause the ineffective assistance of counsel claim to fail. *See Williams*, 706 N.E.2d at 154. Stated differently, "[a]lthough the two parts of the *Strickland* test are separate inquires, a claim may be disposed of on either prong." *Grinstead v. State*, 845 N.E.2d 1027, 1031 (Ind. 2006) (citing *Williams*, 706 N.E.2d at 154).

[12] In arguing that he suffered ineffective assistance of counsel, Benson complains that his trial counsel, Timothy Miller ("Attorney Miller"), provided ineffective assistance in a number of ways. Specifically, Benson asserts that Attorney Miller provided ineffective assistance by failing to: (A) to call Dakarai Fulton as a witness at trial, (B) cross-examine the investigating officer about Fulton's proffered testimony, (C) object to the admission of Donald Brooks's out of court statement, or (D) object to numerous allegedly improper statements made by the deputy prosecutor during both the evidentiary portion of the trial and the State's closing argument. We will discuss each in turn.

## A.  Failure to Call a Potential Eyewitness at Trial

[13] Benson argues that Attorney Miller provided ineffective assistance by failing to call Fulton as a witness at trial. "The decision whether to call a particular witness to testify on behalf of the defendant is a matter within trial counsel's strategy." *Grigsby v. State*, 503 N.E.2d 394, 397 (Ind. 1987) (citing *Marsillett v. State*, 495 N.E.2d 699, 706 (Ind. 1986)). "Absent a clear showing of prejudice, this Court will not declare counsel ineffective for failure to call a particular witness." *Id*. (citing *Marsillett*, 495 N.E.2d at 706).

[14] Benson argues that Attorney Miller provided ineffective assistance at trial by failing to call Fulton, a potential eyewitness to the shooting, as a witness at trial. Specifically, Benson asserts that Fulton's testimony was so vital that Attorney Miller's decision not to call him as a witness cannot be termed "strategic." Appellant's Br. 19. For its part, the State asserts that given Schmitt's and Brooks's consistent identifications of Benson as the shooter coupled with the seeming large credibility issues surrounding Fulton, Benson cannot establish that he was prejudiced by Attorney Miller's decision not to call Fulton as a witness at trial.

[15] During the evidentiary hearing, Fulton testified that between 3:00 and 4:00 a.m. on the date in question, he was "on [his] way" to a Shell gas station located near the corner of 16th and Illinois Streets. PCR Tr. p. 76. While en route to the gas station, he observed a black Dodge Ram truck pulled to the side of the road. The truck had its lights on and appeared to be running. Fulton observed an individual who was "leaned over into the pickup [truck] window." PCR Tr. p. 78. This individual was wearing dark clothing. (PCR Tr. 79) Fulton saw the individual "that was leaned over raised like -- you know, erected himself, stood up, and it was like seven or eight bangs. He unloaded a weapon." PCR Tr. pp. 80-81.

[16] Fulton admitted that he could not see the weapon used in the shooting. However, despite acknowledging that he did not see the weapon used in the

shooting, he claimed that he had seen an individual by the last name Webster[2] with "the weapon earlier that day." PCR Tr. p. 81. Fulton indicated that he did not stop to help the individual in the truck because it was "not within [his] nature." PCR Tr. p. 85. Fulton indicated that given his location, he could not have been seen by the shooter. Fulton did not notify police immediately after the shooting but instead waited until he was incarcerated on unrelated dealing in narcotics charges to come forward with his account. Fulton claimed that he decided to come forward after he saw Benson, whom he was familiar but not friends with, in the Marion County Jail. Fulton further acknowledged that Webster was another drug dealer, saying "[w]e don't deal with each other. We're not -- we're not in it together." PCR Tr. p. 93.

[17] The post-conviction court noted that "it is clear [from the record] that all parties were aware of [Fulton] and his testimony." Appellant's App. Vol. III, p. 57. The post-conviction court further noted that "Fulton is a man who left the scene knowing someone had been hurt because, as he said at the evidentiary hearing, it is not in his nature to help." Appellant's App. Vol. III, p. 57. The post-conviction court indicated that while it could not, from the record presented, determine the reasons for not calling Fulton as a witness, it could determine whether the record showed that "the lack of his testimony prejudiced the defense to an extent that the outcome would have been different had he testified." Appellant's App. Vol. III, p. 57. The post-conviction court

---

[2] Webster's first name is Joseph.

ultimately determined that Benson had failed to make such a showing. We agree.

[18] Fulton was a drug dealer who decided not to render aid to the victim or notify the police of the shooting. Instead, he waited until incarcerated on an unrelated charge before implicating a rival drug dealer. Although Fulton acknowledged that he did not actually see the gun used in the shooting, he nonetheless testified that he had seen Webster with the gun earlier that day. We are perplexed how Fulton could be sure he had seen Webster with the gun in question when he admittedly did not see the gun himself.

[19] Additionally, Fulton's identification of Webster as the shooter was discredited by Schmitt's assertion that Webster was not the shooter. During the course of the investigation, Schmitt was shown two separate photo arrays of potential perpetrators. The first photo array presented to Schmitt contained a picture of Webster and not Benson. After looking at this photo array, Schmitt told investigating officers that she did not recognize anyone whose picture was included in the first array. Upon looking at the second photo array, which included a picture of Benson and not Webster, Schmitt was able to quickly identify Benson, indicating that his picture "just kind of jumped out at me." Tr. p. 162. Further, Schmitt was not the only person to identify Benson as the shooter as both she and Brooks did so.

[20] The decision whether to call Fulton to testify on behalf of Benson was a strategic decision. *See Grigsby*, 503 N.E.2d at 397. Given the obvious

credibility issues stemming from Fulton's proffered testimony, we must agree with the post-conviction court's determination that Benson has failed to make a clear showing of deficient performance in this regard. Accordingly, we must conclude that he has failed to establish that Attorney Miller provided ineffective assistance in this regard. *See id*.

## B. Failure to Question the Investigating Officer about Fulton's Proffered Testimony

In a related claim, Benson also asserts that Attorney Miller was ineffective for allowing the investigating officer to refer to Webster "as simply being the name of a 'guy that hangs around,' [and] not as someone that had also been accused of the crime, and to imply that only Mrs. Schmitt had been shown the Webster photo array." Appellant's Br. p. 20. Benson specifically claims that such testimony was "intentionally misleading" yet easily rebuttable. Appellant's Br. p. 20.

Given the record before us, we conclude that Benson has failed to establish that Attorney Miller provided ineffective assistance by allowing the investigating officer to refer to Webster as someone that "hangs around" instead of questioning the officer about Fulton's accusation that Webster committed the shooting. Appellant's Br. p. 20. Again, review of the record reveals that there were significant credibility concerns surrounding Fulton. As such, as we concluded above, one can reasonably conclude that Attorney Miller made the strategic decision not to highlight Fulton's proffered testimony given the above-described credibility concerns.

[23] We are also unpersuaded that the alleged implication that Schmitt was the only person to view the photo array containing the picture of Webster had any effect on the outcome of Benson's trial. Schmitt testified that she was shown two separate photo arrays of potential perpetrators. The first photo array presented to Schmitt contained a picture of Webster and not Benson. After looking at this photo array, Schmitt told investigating officers that she did not recognize anyone whose picture was included in the first array. Upon looking at the second photo array, which included a picture of Benson and not Webster, Schmitt was able to quickly identify Benson, indicating that his picture "just kind of jumped out at me." Tr. p. 162. Benson does not explain how the alleged implication that Schmitt was the only potential witness to view these photo arrays had any impact on Schmitt's identification of Benson. This is especially true give that fact that contrary to Benson's assertion, Schmitt was not the sole witness who identified Benson as the shooter. As is discussed above, both Schmitt and Brooks identified Benson as the shooter.

[24] Benson has failed to establish that Attorney Miller's performance was deficient in deciding not to question the investigating officer about Fulton's proffered testimony or elicit testimony from the investigating officer that someone other than Schmitt was shown the photo array containing Webster's photo. Benson, therefore, has failed to prove that Attorney Miller provided ineffective assistance in this regard.

# C. Brooks's Prior Statement

[25] Benson next asserts that Attorney Miller provided ineffective assistance by failing to object when the trial court allowed the State to read Brooks's prior statement to the investigating officer into the record. For its part, the State asserts that Attorney Miller cannot be found to have provided ineffective assistance in this regard because Benson suffered no prejudice.

[26] "The Rules of Evidence provide for a three-tiered approach: (1) the unaided testimony of a witness is preferred; (2) if the unaided testimony is not available, the law prefers refreshed recollection; and (3) if the witness's recollection cannot be revived, the recorded recollection exception to the hearsay rule may be available to admit the document which contains the witness's prior knowledge of the facts in question." *Smith v. State*, 719 N.E.2d 1289, 1290-91 (Ind. Ct. App. 1999) (internal quotation omitted). The recorded recollection exception, set forth in Evidence Rule 803(5), provides as follows:

> **Recorded Recollection**. A record that:
>     (A) is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately;
>     (B) was made or adopted by the witness when the matter was fresh in the witness's memory; and
>     (C) accurately reflects the witness's knowledge.
> If admitted, the record may be read into evidence but may be received as an exhibit only if offered by an adverse party.

(bold in original).

[27] As in the first trial, the trial court allowed the State to read Brooks's statement into the record after the State used the statement to refresh his memory during his testimony. Benson concedes in the instant appeal that the State properly used the statement to refresh Brooks's memory, but claims that he was prejudiced by the presentation of the entire statement to the jury. We disagree.

[28] It is undisputed that during Benson's first trial, Attorney Miller vigorously objected to admission of Brooks's statement to the investigating officer. The trial court overruled these objections and admitted the statement. As the post-conviction court found, it was not unreasonable for Attorney Miller "to assume then that from [his] perspective an objection in the second trial would not be sustained." Appellant's App. Vol. III, p. 60.

[29] Further, review of the record reveals that the challenged statement was consistent with Brooks's testimony, specifically his identification of Benson as the shooter. Both Brooks's testimony and the challenged statement were largely consistent with Schmitt's testimony and with the investigating officer's testimony that Brooks identified Benson as the shooter. As such, without deciding whether an objection to admission of the challenged statement would have been sustained, we note the admission of the challenged statement was most likely harmless as it was largely cumulative of other evidence presented to the jury. Given the largely cumulative nature of the challenged statement, Brooks has failed to prove that he was prejudiced by the admission of the statement. Attorney Miller, therefore, cannot be found to have provided ineffective assistance in this regard.

# D. Alleged Prosecutorial Misconduct

[30] Benson last asserts that Attorney Miller provided ineffective assistance by failing to object to certain instances of alleged prosecutorial misconduct during trial. For its part, the State asserts that "[t]he post-conviction court did not adjudicate these allegations of ineffective assistance of counsel because [Benson] did not litigate them before that court."[3] Appellee's Br. p. 21. As such, the State asserts that this assertion is waived. We agree.

[31] "'Issues not raised in the petition for post-conviction relief may not be raised for the first time on post-conviction appeal.'" *Walker v. State*, 843 N.E.2d 50, 57 (Ind. Ct. App. 2006) (quoting *Allen v. State*, 749 N.E.2d 1158, 1171 (Ind. 2001)); *see also* Ind. P-C.R. 1(8) (providing that "[a]ll grounds for relief available to a petitioner under this rule must be raised in his original petition"). Review of the record reveals that Benson did not include his assertion that Attorney Miller provided ineffective assistance on this basis in either his November 22, 2013 PCR petition or his February 14, 2014 amended PCR petition. Likewise, Benson did not present argument during the evidentiary hearing relating to the alleged prosecutorial misconduct. Thus, because Benson did not present this claim to the post-conviction court, the claim is unavailable here and consequently is waived. *Walker*, 843 N.E.2d at 57 (citing *Richardson v. State*, 800 N.E.2d 639, 647 n. 4 (Ind. Ct. App. 2003) (holding that the petitioner

---

[3] The State acknowledges that Benson raised this issue on direct appeal, but correctly notes that Benson did not raise the issue in the underlying post-conviction proceedings.

waived a claim because it was not presented to the post-conviction court), *trans. denied*; *Koons v. State*, 771 N.E.2d 685, 691 (Ind. Ct. App. 2002) (holding that issues not raised in the petition for post-conviction relief may not be raised for the first time on the post-conviction appeal; the failure to raise an argument in the petition waives the right to raise the argument on appeal), *trans. denied*).

## II. Newly Discovered Evidence

[32]     Benson also contends that he is entitled to a new trial in light of certain newly discovered evidence.

> New evidence mandates a new trial only when a defendant demonstrates that: (1) the evidence has been discovered since trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) it is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result at trial. *Taylor v. State*, 840 N.E.2d 324, 329-30 (Ind. 2006). We "analyze[ ] these nine factors with care, as the basis for newly discovered evidence should be received with great caution and the alleged new evidence carefully scrutinized." *Id*. at 330 (quotation omitted). The burden of showing that *all* nine requirements are met rests with the petitioner for post-conviction relief. *Id*.

*Whedon v. State*, 900 N.E.2d 498, 504 (Ind. Ct. App. 2009), *summarily aff'd*, 905 N.E.2d 408, 409 (Ind. 2009).

[33]     In arguing that he is entitled to a new trial in light of certain newly discovered evidence, Benson asserts the following:

> Since Mr. Benson's trial in 1999, there has come into existence important new scientific evidence in the area of eyewitness identification. Because Mr. Benson's conviction in this case rested almost entirely on the purported eyewitness identification of him as the shooter by one witness, the scientific evidence regarding eyewitness identifications constitutes newly discovered evidence that entitles him to a new trial where that evidence can be presented.

Appellant's Br. p. 27. In support of this assertion, Benson called Dr. Geoffrey Loftus, a professor in the Department of Psychology at the University of Washington, as a witness during the evidentiary hearing. Dr. Loftus is an experimental psychologist whose "general research area has to do with human perception, the means by which people get information by their sense organs into their brain; and the associated study of human memory, the study of how information, once in the brain, is transformed, stored and used later for any task that requires memory." PCR Tr. p. 6.

[34] With regard to this particular case, Dr. Loftus testified that before appearing in court, he reviewed "some police reports, some trial testimony, deposition testimony, information provided to me by Mr. Benson back in 2009 when I originally got involved in this case. And in particular, statements by one of the main eyewitnesses in the case." PCR Tr. p. 20. Dr. Loftus went on to testify at length about his research into how memory works and how certain factors can impact one's memory.

[35] After the State objected to Dr. Loftus's continued testimony, the post-conviction court questioned the relevance of Dr. Loftus's testimony regarding

how memory works in the post-conviction proceedings because "[t]his is all information that would have been available at the time of the trial, lighting, distance, accuracy of the victim's perception -- witness's perception." PCR Tr. p. 23. Benson argued that Dr. Loftus's testimony was relevant because it included newly discovered evidence of "research that's been conducted since this trial was held on the ability of witnesses to view certain distances under certain conditions." PCR Tr. p. 23. After allowing Dr. Loftus to continue his lengthy testimony about how factors like distance, lighting, attentiveness, and duration can impact an individual's ability to identify someone, the post-conviction court stated the following:

> I have to say that as learned as the professor is, what I've heard so far is that distance, lighting, attentiveness and duration all affect a witness's perception and ability to ID somebody.
>
> And I'm not sure how this would assist the trier of fact since that's always an issue in an eyewitness identification case.
>
> And how is -- has this -- has this study that he's conducted by accepted by any courts as scientific evidence that's admissible in court under those restrictions?
>
> ****
>
> But this -- now you're getting into a specific study with specific outcomes, mathematical calculations to show jurors that this is how much blurring would occur. And I think that's a specific scientific experiment that's been conducted. And if you're asking or want the Court to say counsel was ineffective or that this is newly discovered evidence, I need to know if this is newly discovered evidence that's been accepted by courts as scientifically accepted procedure.

> So yeah. The fact that he's an expert in his field doesn't cover
> the -- would not cover those issues.

PCR Tr. pp. 43-44. In response to the post-conviction court's concerns, Dr. Loftus indicated that general testimony about the article had been permitted "in a couple of cases in the State of Massachusetts" and "a couple of times in the State of Washington where it has come up in jury trial." PCR Tr. p. 44.

[36] Benson's counsel then questioned Dr. Loftus about whether he believed that an individual could make a visual identification of another person from a distance of 100 to 150 feet. Dr. Loftus indicated, over the State's objection, that given his research into to mathematical calculations as to when blurring generally occurs, he believes that "at about 150 feet away, a witness's ability to correctly identify somebody falls to essentially zero." PCR Tr. p. 49. Dr. Loftus continued that "100 feet during the day, wouldn't preclude a witness's ability to correct identify somebody but the chances would be relatively low" but at night, "the chances would be essentially nil according to the research that we've done." PCR Tr. p. 50. Benson's counsel then introduced pictures of Benson which Dr. Loftus had intentionally blurred based on his mathematical calculations relating to blurring. The post-conviction court admitted these pictures over the State's objection. Dr. Loftus later testified that his research into to the mathematical calculations for when blurring typically occurs was not available prior to 2000.

[37]    Following conclusion of the evidentiary hearing, the post-conviction court concluded that Benson failed to meet his burden of proving that Dr. Loftus's research, *i.e.*, the allegedly newly-discovered evidence, necessitated a new trial. In reaching this conclusion, the post-conviction court explained:

> 15.  Dr. Loftus testified that he is a psychology professor at the University of Washington in Seattle.  He stated he has conducted research in the area of human perception.  Among his findings he testified to were how witness's perceptions are affected by lighting conditions, distance, length of time to view an event, presence of distractions, and cross-racial identification reliability. He also testified as to research on photo arrays and possibilities of suggestibility in viewing photo arrays.
>
> ****
>
> At a minimum the Court finds that the purpose for this evidence would be to impeach the eyewitness' testimony.  Further, witnesses were questioned on vantage points and viewing conditions; the jury had these factors to consider, even if they did not have Dr. Loftus'[s] particular study to weigh the evidence. And again, even if Dr. Loftus'[s] study had been available in 1999 and was not presented to the jury, there is very little likelihood that counsel would be deemed ineffective for failing to present it in these circumstances, for reasons previously mentioned.
>
> *Conclusion*
>
> Defense counsel presented a vigorous and substantial defense to the jury.  The State's evidence was rigorously challenged and subjected to close scrutiny.  The fact that Petitioner was ultimately convicted does not equate to … an unfair trial.  The Court finds that Petitioner has failed to meet his burden of proof.

Appellant's App. Vol. III, pp. 54, 61-62 (italics and underlining in the original).

[38] Despite Benson's assertion to the contrary, on review, we agree with the post-conviction court's determination that the proffered allegedly newly discovered evidence would merely have served as an attempt to impeach the credibility of Schmitt's identification of Benson as the shooter. Although Dr. Loftus's study had not been completed or published as of the date of Benson's trial, the same factors discussed by Dr. Loftus were known at the time. In fact, defense counsel thoroughly questioned Schmitt during cross-examination about these factors, including her vantage point and the viewing conditions. Benson has failed to establish in the instant post-conviction proceedings that the introduction of Dr. Loftus's study at trial would have resulted in a different result. We therefore conclude that Benson failed to meet his burden of proving that the proffered allegedly newly discovered evidence necessitated a new trial.

## Conclusion

[39] In sum, we conclude that Benson failed to establish that he suffered ineffective assistance of trial counsel or that the proffered allegedly newly-discovered evidence necessitated a new trial. Accordingly, we affirm the judgment of the post-conviction court.

[40] The judgment of the post-conviction court is affirmed.

Baker, J., and Mathias, J., concur.