



FILED

Dec 08 2025, 8:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Court of Appeals of Indiana

Matthew Dale Thies, Sr.,

*Appellant-Petitioner*

v.

State of Indiana,

*Appellee-Respondent*

---

December 8, 2025

Court of Appeals Case No.
24A-PC-2600

Appeal from the Dearborn Superior Court

The Honorable Jonathan N. Cleary, Judge

Trial Court Cause No.
15D01-1312-PC-9

---

**Opinion by Judge Bradford**
Judges May and Mathias concur.

**Bradford, Judge.**

# Case Summary

In 2011, Matthew Dale Thies, Sr., was convicted of three counts of Class A felony child molesting and two counts of Class C felony child molesting. Thies was sentenced to an aggregate forty-year sentence, and his convictions were affirmed on appeal.[1] *See Thies v. State*, 2012 WL 4470999 (Ind. Ct. App. Sept. 28, 2012), *trans. denied*. Thies petitioned for post-conviction relief ("PCR"), which petition was denied by the post-conviction court on September 26, 2024. We affirm.

# Facts and Procedural History

Our memorandum decision in Thies's direct appeal, which was handed down on September 28, 2012, instructs us to the underlying facts and procedural history leading to this post-conviction appeal:

> In February 2010, Thies and his then four-year-old son, M.T., moved in with his girlfriend, S.T. ("Mother"). Mother had two children: then nine-year-old daughter, C.T., and then six-year-old son, C.S.
>
> In March 2010, C.T., who was in the fourth grade, told her school counselor, Angela Schmarr, that Thies "was spanking [her and her brother] really hard with a belt" and that he was leaving bruises. (Tr. 715). Child Protective Services ("CPS") went to C.T.'s house, and she told them that Thies had spanked her with

---

[1] Thies did not challenge his sentence on direct appeal.

a belt.  CPS did not check C.T. for bruises and did not return to the house.

In the Summer of 2010, then nine-year-old, C.T. started to have "bleeding from her privates" despite the fact that she showed no signs of entering puberty, such as breast development or growth of pubic hair.  (Tr. 641).  After contacting a doctor about the situation, Mother thought that hormones contained in food may have caused C.T. to start menstruating early.  C.T. had recurrent bleeding during that Summer and Fall, and on those various occasions, C.T. showed Mother that her underwear had blood on it and that her "privates" were "swelled [sic] and raw and sore[.]" (Tr. 642).

In early November 2010, C.T.'s aunt, J.P. ("Aunt"), who babysat for C.T. while Mother and Thies were at work, saw Thies lying on the floor with then ten-year-old C.T., who was rubbing his arm.  A few weeks later, Aunt saw Thies lying in his bed with C.T., who was rubbing his chest.

In early December 2010, C.T. told her friends, Z.M. and L.B., that Thies "was doing bad things to her[,]" (Tr. 834, 835), "like trying to get her into bed."  (Tr. 841).  C.T. also told them that "[s]he got raped."  (Tr. 1027).  Z.M. told C.T. that she needed to "tell a trusted soul like her mom ... [or] Mrs. Schmarr[.]"  (Tr. 837).

On December 7, 2010, C.T. told school counselor Schmarr that Thies "had been touching her in [her] private parts, and that he also had her suck his private part" while "her clothes were off." (Tr. 296).  C.T. told Schmarr that Thies started doing these things in the summer after he moved in with them.  After Schmarr reported the allegations to CPS, Detective Joseph Vance from the Dearborn County Sheriff's Department started an investigation into the allegations.

On December 8, 2010, Stephanie Black of the Child Advocacy

Center conducted a videotaped interview with C.T. During the interview, C.T. told Black that Thies had made her suck his "private area," which he referred to as his "dick"; that he had touched her in inappropriate places, specifically on her "private parts" or vaginal area with his private area; that he had touched her private area with his finger; that he had made her touch and rub his private area; and that he had kissed or licked her vaginal area. (State's Ex. 32). C.T. stated that Thies had done these things multiples times and that it started after Thies moved in with them.

C.T. explained that the first time he touched her inappropriately was on a Saturday in the summer when Mother was at work. C.T. recounted in detail how Thies made her go to his bedroom, take off her clothes, and get in bed with him. In her own terms, she explained how he forced her to have sexual intercourse and how he forced her to perform oral sex on him. She described Thies's breathing and how "wet stuff" that tasted "weird" and "nasty" would come out of the top of his penis when he said what she was doing felt good. (State's Ex. 32).

C.T. explained that he molested her on Fridays, Saturdays, Mondays, and Tuesdays, which was when Mother worked. C.T. explained that the molestations usually occurred in Thies's bedroom but that he had also molested her in her bedroom, the laundry room, and the bathroom. C.T. was able to describe the physical appearance of Thies's penis and how it felt. She also recounted how Thies sometimes made her stay in his bedroom and rub his back while he played video games or would have her "pop" his back by standing on it.

Additionally, C.T. described the details of the last time that Thies molested her, which happened two days prior to her interview and the day before she reported the molestations to school counselor Schmarr. C.T. recounted that Thies went into her bedroom, woke her up, and made her suck on his "private area." (State's Ex. 32). She explained that his "wet stuff" went in her

mouth and that a "little bit" had gotten on her bed. (State's Ex. 32). She stated that she wiped it off with some wet toilet paper, which she threw away in a downstairs trash can when she got a drink. C.T. stated that she wanted Thies to move out so he would stop doing these things to her.

After the interview, Detective Vance talked with Mother and arranged for the police to go to the house to collect some physical evidence. Thereafter, Detective Vance and Sheriff's Department crime scene investigator Detective Ed Lewis went to C.T.'s house and collected C.T.'s sheets, pillows, and blankets, a water bottle, a towel, and some toilet paper. Some of these items were later tested by the Indiana State Police laboratory. The toilet paper tested "presumptively positive for seminal material" and negative for a sperm search, (Tr. 484), and DNA testing on it revealed that it "matche[d] the DNA profile" of Thies. (State's Ex. 42 at 2). Additionally, DNA testing of C.T.'s pillow case revealed that it contained a DNA mixture from which Thies could not be excluded.

Also, on December 8, 2010, Detective Vance interviewed Thies, who repeatedly denied the allegations against him. After this interview, Detective Vance went back to the house and collected additional evidence, including pornographic DVDs and a pornographic magazine belonging to Thies.

On December 9, 2010, C.T. was examined at Cincinnati Children's Hospital. The physical examination of C.T. revealed no tears or injury to her hymen. It also revealed that C.T. had not yet entered puberty. The examining nurse collected evidence for a sexual assault kit, and C.T.'s oral, vaginal, and anal swabs later tested presumptively positive for seminal material and negative for a sperm search. No male DNA was detected in DNA testing of the assault kit.

On December 10, 2010, Detective Vance and Detective Garland Bridges individually interviewed Thies. During the interviews,

Thies initially denied any sort of sexual contact between himself and C.T. Later in the interviews, Thies admitted that, on December 6, C.T. had touched the base of his penis when she was lying in bed with him, but he claimed that he told her to stop. Thies told the detectives that he had a nightly ritual where he would lie in C.T.'s bed with her or she would lie in his bed with him with the door shut. Thies also informed the detectives that C.T. would push her pelvic area against him or push her buttocks into his crotch area. Thies told Detective Vance that C.T. would walk on his back to "pop" it and would sit on his buttocks and rub his back, and he told Detective Bridges that C.T. said she had a sexual fantasy about him. (Tr. 599).

On December 22, 2010, the State charged Thies with seventeen counts of child molesting, which included eleven class A felony counts and six class C felony counts. The State subsequently amended the charging information on the day of trial and proceeded on three counts of class A felony child molesting and two counts of class C felony child molesting.

The trial court held a seven-day jury trial in June 2011. Prior to the submission of evidence, the trial court granted the State's request for a motion in limine prohibiting the introduction into evidence of: (1) an allegation that Thies had abused another child; (2) a book titled *How to Make Love Like a Porn Star;* and (3) an unsubstantiated CPS report regarding an allegation that Thies had spanked C.T.

During voir dire, one of the prospective jurors, K.M., informed the prosecutor that he recognized the name of one of the scheduled witnesses, Ed Lewis, who was a detective with the Dearborn County Sheriff's Department and had previously worked for the Indiana State Police. K.M. stated that he currently worked for Honda, but that he had previously worked for the Indiana State Police for seven years in the commercial vehicle enforcement division and that he "kn[e]w Ed Lewis from that acquaintance." (Tr. 204). When questioned by the

prosecutor, K.M. affirmed that his previous work in law enforcement would not affect his ability to be fair and impartial. Thies's attorney challenged "for cause" the seating of K.M. as a juror based on the facts that K.M. "was a State Police Officer and he also kn[e]w Ed Lewis[,] one of the witnesses in this case." (Tr. 206). The trial court denied Thies's challenge, and K.M. was placed on the jury.

At trial, Thies's defense was that C.T. made up the allegations of child molest against Thies because she was upset that Thies was disciplining her and because they had had a fight about whether she would get a cell phone for Christmas. During opening statements, Thies's attorney asserted that this case was all about credibility and would be based on C.T.'s word against Thies's word. Also during opening statements, Thies's attorney started to make a reference to the book *How to Make Love Like a Porn Star,* and the prosecutor asked for a bench conference, during which the trial court reminded Thies's attorney of the motion in limine prohibiting any reference to this book.

Dr. Robert Shapiro, the medical director from Cincinnati Children's Hospital, testified that C.T.'s physical examination revealed that she had not yet entered puberty. He further testified that if a ten-year-old girl had not entered puberty but had genital bleeding, it would indicate that the bleeding was caused by trauma to her genitalia. Dr. Shapiro testified that, from C.T.'s examination, he was unable to determine if sexual abuse had occurred. However, when asked for his opinion on the likelihood of sexual abuse given C.T.'s exam and history and the fact that C.T. had not had a period over the past six months since Thies had moved out, Dr. Shapiro opined that "she was likely sexually abused." (Tr. 448).

The State introduced into evidence the Indiana State Police Laboratory test results on the evidence collected that had been submitted for analysis. In addition, Mother testified that she saw that C.T. had vaginal bleeding and swelling during the Summer

of 2010 despite the fact that C.T. had showed no signs of entering puberty. Mother further testified that since Thies moved out in December 2010, C.T. had not had any vaginal bleeding nor had she started her period.

During the trial, Thies made several offers of proof in an attempt to have the trial court reconsider some of the things that were ordered excluded by the pre-trial motions in limine. Specifically, Thies made an offer to prove to try to present evidence that the book *How to Make Love Like a Porn Star* was found in C.T.'s house; that C.T. had previously reported that Thies had spanked her and that CPS had filed a report that the spanking allegations were unsubstantiated; and that C.T. had made allegations that Thies had sexually abused his niece, Sk.T. The trial court denied Thies's requests to admit all of this evidence.

Thies testified in his own defense. During his testimony, Thies admitted that he had spanked C.T. and her brother and testified that he would threaten to use a belt on them. Thies also testified that, before C.T. had accused him of the molestations, he thought she had been having a sexual fantasy about him. He further testified that, prior to the molestation allegations, C.T. had rubbed her pelvic area on his leg when she hugged him. Thies testified that, despite these actions, he had lain in bed with C.T. in the evenings because he "was trying to fix the problems that she had" and because he wanted to be "a father figure[.]" (Tr. 984). Additionally, Thies admitted that C.T. had touched his penis on December 6, 2010, but he denied that he had molested C.T. in any manner.

The jury found Thies guilty as charged. The trial court sentenced Thies to an aggregate sentence of forty (40) years, with thirty (30) years executed and ten (10) years suspended to probation.

*Id.* at *1–4 (brackets and emphases in original, footnotes omitted), *trans. denied*.

Thies appealed, arguing that the trial court had abused its discretion in denying his for-cause challenge to K.M.'s placement on the jury and "by excluding the following evidence: (a) testimony that C.T.'s allegation that Thies had spanked her with a belt was unsubstantiated by CPS; (b) testimony that the book *How to Make Love Like a Porn Star* was found in C.T.'s house; and (c) testimony that C.T. had alleged that Thies had molested Sk.T. and that Sk.T. denied being molested." *Id.* at *9 (emphasis in original). In affirming Thies's convictions, we found that Thies had "waived review of his arguments that the trial court abused its discretion by denying his for-cause challenge of a juror and by excluding certain evidence. Waivers notwithstanding, we conclude[d] that there was no error in the trial court's rulings on the for-cause challenge or the exclusion of evidence." *Id.* at *15.

Thies petitioned for PCR on December 13, 2013. He amended his petition on June 2, 2022, to include a claim that his trial counsels, Lynn Bibbs and Israel Cruz, had provided ineffective assistance. On September 26, 2024, following a two-day evidentiary hearing, the post-conviction court denied Thies's request for PCR.

## Discussion and Decision

"Post-conviction procedures do not afford the petitioner with a super-appeal." *Williams v. State*, 706 N.E.2d 149, 153 (Ind. 1999). "Instead, they create a narrow remedy for subsequent collateral challenges to convictions, challenges which must be based on grounds enumerated in the post-conviction rules." *Id.*

A petitioner who has been denied post-conviction relief appeals from a negative judgment and as a result, faces a rigorous standard of review on appeal. *Dewitt v. State*, 755 N.E.2d 167, 169 (Ind. 2001); *Collier v. State*, 715 N.E.2d 940, 942 (Ind. Ct. App. 1999), *trans. denied*.

[6] Post-conviction proceedings are civil in nature. *Stevens v. State*, 770 N.E.2d 739, 745 (Ind. 2002). Therefore, in order to prevail, a petitioner must establish his claims by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); *Stevens*, 770 N.E.2d at 745. When appealing from the denial of a PCR petition, a petitioner must convince this court that the evidence, taken as a whole, "leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court." *Stevens*, 770 N.E.2d at 745. "In other words, the defendant must convince this Court that there is *no* way within the law that the court below could have reached the decision it did." *Id.* (emphasis in original). "It is only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion, that its decision will be disturbed as contrary to law." *Godby v. State*, 809 N.E.2d 480, 482 (Ind. Ct. App. 2004), *trans. denied*. "The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses." *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004).

[7] Thies contends that the post-conviction court erred in rejecting his claim that his trial counsel had rendered ineffective assistance. "The right to effective counsel is rooted in the Sixth Amendment of the United States Constitution." *Taylor v. State*, 840 N.E.2d 324, 331 (Ind. 2006). "'The Sixth Amendment

recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 685 (1984)). "'The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Id.* (quoting *Strickland*, 466 U.S. at 686).

[8] A successful claim for ineffective assistance of counsel must satisfy two components. *Reed v. State*, 866 N.E.2d 767, 769 (Ind. 2007). Under the first prong, the petitioner must establish that counsel's performance was deficient by demonstrating that counsel's representation "fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the 'counsel' guaranteed by the Sixth Amendment." *Id.* (internal quotation omitted). "We recognize that even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or the most effective way to represent a client," and therefore, under this prong, we will assume that counsel performed adequately and defer to counsel's strategic and tactical decisions. *Smith v. State*, 765 N.E.2d 578, 585 (Ind. 2002). "Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective." *Id.*

[9] Under the second prong, the petitioner must show that the deficient performance resulted in prejudice. *Reed*, 866 N.E.2d at 769. A petitioner may show prejudice by demonstrating that there is "a reasonable probability (*i.e.* a

probability sufficient to undermine confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different." *Id.* (italics added, internal quotation omitted).

[10] A petitioner's failure to satisfy either prong will cause the ineffective assistance of counsel claim to fail. *See Williams*, 706 N.E.2d at 154. Stated differently, "[a]lthough the two parts of the *Strickland* test are separate inquires, a claim may be disposed of on either prong." *Grinstead v. State*, 845 N.E.2d 1027, 1031 (Ind. 2006) (citing *Williams*, 706 N.E.2d at 154).

[11] At the post-conviction hearing, attorney Cruz made several statements about the defense team's performance which Thies claims proves that trial counsel had rendered deficient performance. Specifically, attorney Cruz testified there had been no strategic reason for failing to object to the alleged vouching testimony from Dr. Shapiro and the prosecutor. As it relates to Dr. Shapiro, when asked about a hypothetical situation with facts similar to the facts of the instant case, Dr. Shapiro opined that the hypothetical victim had likely been sexually abused. However, when responding to the hypothetical, Dr. Shapiro did not opine on C.T.'s credibility, Thies's guilt, or general truthfulness of child victims. His statements were limited to his medical opinion based on the facts presented to him, which included vaginal bleeding from a prepubescent child that stopped after a particular person lost access to the prepubescent child.

[12] With regard to the prosecutor, as the State acknowledges, some of the prosecutor's statements during its opening argument "might constitute

impermissible" vouching by the prosecutor, including statements that C.T. would tell the truth, that her account was "not made up" and "did happen[,]" and C.T.'s descriptions of Thies's acts would could only be obtained through experience. Appellee's Br. p. 30. Thies argues that it was improper for the prosecutor to personally vouch for C.T.'s credibility. *See Gaby v. State*, 949 N.E.2d 870, 880 (Ind. Ct. App. 2011) ("It is inappropriate for a prosecutor to make an argument which takes the form of personally vouching for a witness."). We recognize, however, that trial counsel's decision not to object could have been a tactical decision not to highlight the prosecutor's arguments before the jury. *See Charlton v. State*, 702 N.E.2d 1045, 1051 (Ind. 1998) (providing that counsel was not ineffective for failing to object to the prosecutor's statements during closing argument because counsel's "failure to object could well have been a strategic decision by counsel"). Furthermore, the jury was instructed that comments by counsel, including the prosecutor, were not evidence, and we will assume the jury did not treat the prosecutor's comments as such. *See Weaver v. State*, 258 N.E.3d 1048, 1062 (Ind. Ct. App. 2025) (providing that when the jury has been instructed not to consider specific evidence or argument, we assume that the jury followed the instruction), *trans. denied*. Although trial counsel could have objected to the prosecutor's improper vouching statements, for the reasons discussed below, we cannot say that trial counsels' failure to do so rendered their representation ineffective.

[13] Attorney Cruz also testified that co-counsel's preparation for Dr. Shapiro's cross-examination was inadequate because she had failed to read Dr. Shapiro's

published articles.  Attorney Cruz's testimony fails to establish how such preparation would have changed the defense's approach in questioning Dr. Shapiro, who had acknowledged that he could not definitely conclude that sexual abuse had occurred.[2]

[14]  Finally, Attorney Cruz testified that the recording of C.T.'s forensic interview "should not have been allowed to be played."  PCR Tr. p. 97.  The recording of C.T.'s forensic interview was admitted after trial counsel's questioning of C.T. on cross-examination highlighted minor inconsistencies between some of C.T.'s statements in the interview and at trial.  The Indiana Supreme Court has held that

> [a]fter a witness' credibility has been attacked using portions of a prior statement, the fact finder must be permitted to determine for itself the extent of the inconsistencies in context.  This proposition must be even more true when the alleged discrepancies relate to small details while the majority of the statements are consistent.

*Birdsong v. State*, 685 N.E.2d 42, 46 (Ind. 1997) (internal quotation and citation omitted).  Attorney Cruz's testimony regarding counsel's failure to object to the admission of C.T.'s prior statements does not establish that an objection by

---

[2]  Without citation to authority, Thies argues that it was somehow improper for the prosecutor and Detective Vance to refer to C.T. as a victim several times.  We do not agree with this argument.  *See generally, Neville v. State*, 976 N.E.2d 1252, 1260 (Ind. Ct. App. 2012) ("[A]n attorney may properly argue any logical or reasonable conclusions based on his or her own analysis of the evidence."), *trans. denied*.

counsel would have been successful, only that he did not believe it should have been played during trial.

[15] Even assuming that the alleged errors were sufficient to establish deficient performance under the first *Strickland* prong, the prejudicial effect of these alleged errors must be viewed in context of the trial proceedings as a whole. Upon review, we conclude that Thies cannot demonstrate the requisite prejudice.

[16] Again, to prove prejudice, Thies must demonstrate that there is a reasonable probability that, but for counsels' allegedly deficient performance, the outcome of his trial would have been different. *See Reed*, 866 N.E.2d at 769. Thies cannot make this demonstration because the evidence against him was substantial and largely independent of the alleged errors.

[17] C.T.'s account of the abuse was detailed and consistent. Her disclosures to a friend, school counselor, and forensic interviewer were consistent across multiple settings. Her account correlated with physical evidence, namely toilet paper containing seminal material that matched Thies's DNA profile. Moreover, the evidence indicated that C.T. had yet to enter puberty but had experienced unexplained vaginal bleeding and swelling that ceased after Thies moved out of the home.

[18] Significantly, Thies's own admissions to police were particularly damaging. He acknowledged having a "nightly ritual" where he would lie in C.T.'s bed with her or she would lie in his bed with him with the door shut. Trial Tr. Vol. III p.

599. He also admitted that during this "nightly ritual," C.T. "would be laying in bed with him and that she would push her pelvic area up against him, and … push her buttocks into his cro[t]ch area." Trial Tr. Vol. III p. 600. Thies told police that after walking on his back to "pop" it, C.T. would sit on his buttocks and rub his back. Trial Tr. Vol. III p. 599. He also expressed the belief that C.T. had had sexual fantasies about him. Finally, Thies admitted that C.T. had, on at least one occasion, touched the base of his penis, although he claimed that he had told her to stop.

[19] The alleged errors identified by trial counsel, whether considered individually or cumulatively, pale in significance when measured against the overwhelming evidence of guilt. Given Thies's detailed admissions about inappropriate conduct, C.T.'s specific and consistent statements about the sexual acts, the correlation between her account and the physical evidence, and the medical evidence of trauma, Thies has failed to demonstrate that a reasonable jury could have reached a different verdict but for counsels' alleged errors. As such, even if trial counsels' performance may have fallen short of ideal standards in some respects, Thies has failed to prove that he was prejudiced by the alleged errors. The post-conviction court, therefore, did not err in determining that Thies did not prove that he had received ineffective assistance of trial counsel.

[20] The judgment of the post-conviction court is affirmed.

May, J., and Mathias, J., concur.

ATTORNEY FOR APPELLANT

Michael C. Cunningham
Baldwin, Perry & Wiley, P.C.
Franklin, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Robert M. Yoke
Deputy Attorney General
Indianapolis, Indiana